**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

COVERALL NORTH AMERICA, INC.

Petitioner,

vs.

**SANDRA LISBOA and MIRIAM CARVALHO,**

Respondents.

05 - 11868 RWZ

Civil Action No.

RECEIPT # 66903
AMOUNT $250
SUMMONS ISSUED ✓
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY. CLK. DM
DATE 9/15/05

## PETITION TO COMPEL ARBITRATION

Petitioner, Coverall North America, Inc. ("Coverall"), by its attorneys, as and for its Petition to Compel Arbitration pursuant to Section 4 of the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.*, states as follows:

MAGISTRATE JUDGE RBC

### Nature Of The Action

1.      This is an action brought pursuant to § 4 of the Federal Arbitration Act, 9 U.S.C. § 4, to compel arbitration. Pursuant to the written Franchise Agreement entered into by and between Petitioner Coverall and Respondents, the parties agreed to submit all disputes arising out of or relating to the Franchise Agreement, its validity or the relationship of the parties, to arbitration to be conducted in Massachusetts before the American Arbitration Association.

2.      After a dispute arose between the parties, and after the parties' efforts to mediate those disputes proved unsuccessful, Coverall commenced arbitration proceedings against the Respondents. Shortly after the arbitration proceedings were commenced, Respondents' counsel advised the American Arbitration Association that Respondents disputed "that there is a valid arbitration agreement between them and Coverall."

3.     By this action, Coverall seeks to compel Respondents to arbitrate the dispute set forth in Coverall's Demand for Arbitration, as well any counterclaims Respondents intend to assert against Coverall, as provided for in the parties' written arbitration agreement.

## The Parties

4.     Petitioner Coverall is a Delaware corporation with its principal place of business in Boca Raton, Florida. Coverall is engaged in the business of granting franchises to qualified persons to operate commercial janitorial cleaning businesses, and to use Coverall's trade names and marks, as well as Coverall's operating system (the "Coverall® System"), in connection therewith. Coverall franchisees are provided with, among other things, training, equipment, billing and collection services, and a quality control program. Coverall also provides its franchisees customer accounts to clean. Under the Coverall System, Coverall enters into contracts with customers for cleaning services, and delegates the performance of the services under the contracts to its franchisees.

5.     Respondents Sandra Lisboa and Miriam Carvalho are franchisees of Coverall. On information and belief, the Respondents are residents and citizens of the Commonwealth of Massachusetts.

## Jurisdiction and Venue

6.     This action arises under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq*.

7.     This Court has original subject matter jurisdiction of this action in that, save for the parties' agreement to arbitrate, this Court would have jurisdiction under 28 U.S.C. § 1332 of a civil action arising out of the controversy between the parties, in that the parties are citizens of different States and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

- 2 -

~BOST1:391130.v1

8.     Venue is proper in this Court under 9 U.S.C. § 4, in that this is the United States District Court having jurisdiction over the contractually specified site of arbitration, and 28 U.S.C. § 1391, in that a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

### The Franchise Agreements And The Parties' Arbitration Agreements

9.     On or about July 24, 2002, Sandra Lisboa and Miriam Carvalho entered into a written Janitorial Franchise Agreement with Coverall d/b/a Coverall of Boston pursuant to which Coverall granted Lisboa and Carvalho a franchise to operate a commercial janitorial business in the Boston, Massachusetts area.

10.     Under Section 21 of the Franchise Agreement, the parties explicitly agreed that they would submit all disputes arising out of or relating to the Agreement, the validity of the Agreement or the parties' relationship to arbitration before the American Arbitration Association. Section 21 of the Franchise Agreement provides, in pertinent part, that:

> [A]ll controversies, disputes, or claims between Coverall, its officers, directors, agents and/or employees (in their respective capacities) and Franchisee (and Franchisee's owners, officers, directors and/or any guarantors of this Agreement) arising our of or related to the relationship of the parties, this Agreement, any related agreement between the parties, and/or any specification, standard or operating procedure of Coverall, including those set forth in the Coverall Policy and Procedure Manual . . . shall be submitted promptly for arbitration.

> Arbitration shall be subject to the Federal Arbitration Act and, except as otherwise provided in this Agreement or agreed upon by the parties, the then current Rules of the American Arbitration Association for Commercial Arbitration.

> The arbitration shall take place in the Area in which the Franchisee conducts its business, and shall be administered by the office of the American Arbitration Association or as mutually agreed by the parties.

> \* \* \*

- 3 -

Franchisee and Coverall agree that arbitration shall be conducted on an individual, not class wide basis.

11.     Section 21.C of the Franchise Agreement provides that "Should either Party incur attorney's fees in order to enforce the terms and conductions of this Agreement, including post-term covenants, whether or not an arbitration proceeding is instituted, the prevailing party shall be entitled to reimbursement by the other party of all litigation costs, including attorneys' fees."

12.     The parties' written arbitration agreement is valid, has not been revoked and is enforceable upon such grounds as exist at law or in equity.

13.     The parties' written arbitration agreement appears in a contract evidencing a transaction involving interstate commerce.

14.     The making of the arbitration agreement is not at issue. Nor is any failure to comply therewith.

15.     Coverall is not in default in proceeding with such arbitration by failing, neglecting, or refusing to arbitrate under the parties' written agreement to arbitrate.

## Respondents' Refusal To Arbitrate Their Disputes

16.     In or around early 2005, a dispute arose between the parties. The dispute was subsequently submitted to non-binding mediation in accordance with the provisions of the parties' Franchise Agreement. The parties were not able to resolve their disputes.

17.     On August 30, 2005, Coverall filed an arbitration proceeding against Respondents seeking to resolve its various claims. The arbitration is captioned as *Coverall North America, Inc. v. Sandra Lisboa and Miriam Carvalho*, Case No. 11-114-01902-05. Coverall's Demand for Arbitration seeks, among other things, declaratory relief and attorneys' fees. (A true and correct copy of the Demand for Arbitration is attached hereto as Exhibit A.)

- 4 -

~BOST1:391130.v1

18.     In a September 14, 2005 letter to the American Arbitration Association, Respondents' counsel stated that Respondents "dispute that there is a valid arbitration agreement between them and Coverall." The presumed basis for this belief is Respondents' contention that Respondents "should have been classified as employees of Coverall, rather than independent contractors" – an assertion that Respondents' counsel asserted would be part of a class action lawsuit to be filed against Coverall. (A copy of this letter is attached hereto as Exhibit B.)

19.     Respondents' claim that they should have been classified as employees of Coverall rather than independent contractors arises out of or relates to "the relationship of the parties" and the Franchise Agreement, and therefore falls within the scope of the parties' written arbitration agreement.

## Specific Relief To Compel Arbitration

20.     Respondents' assertion that they are not bound to arbitrate their dispute with Coverall constitutes a failure, neglect and/or refusal on their part to arbitrate in accordance with the parties' written arbitration agreement.

21.     Petitioner has no adequate remedy at law.

22.     No previous Petition has been made for the relief requested herein.

- 5 -

## PRAYER FOR RELIEF

**WHEREFORE,** Petitioner Coverall North America, Inc. respectfully prays for the

following relief against Respondents:

A.     An order pursuant to Section 4 of the Federal Arbitration Act ("FAA"), 9 U.S.C.
§ 4, made in the manner provided by law for the making and hearing of motions, compelling
arbitration in accordance with the terms of the parties' arbitration agreement;

B.     An award of reasonable attorneys' fees, expenses and costs incurred by Coverall
in this action; and

C.     Such other relief as the Court deems just and proper.

### COVERALL NORTH AMERICA, INC.,

By its attorneys,

Michael D. Vhay (BBO #566444)
Traci S. Feit (BBO# 660688)
DLA PIPER RUDNICK GRAY CARY US LLP
One International Place, 21st Floor
100 Oliver Street
Boston, MA 02110-2600
(617) 406-6000 (*telephone*)
(617) 406-6100 (*fax*)

Dated: September 15, 2005

- 6 -

.

## BEFORE THE AMERICAN ARBITRATION ASSOCIATION
## BOSTON, MASSACHUSETTS

**COVERALL NORTH AMERICA, INC.,**

Claimant,

v.

**SANDRA LISBOA and MIRIAM CARVALHO,**

Respondents.

## DEMAND FOR ARBITRATION

Claimant, Coverall North America, Inc. ("Coverall"), by its attorneys, as and for ts

Demand for Arbitration against Respondents, Sandra Lisboa ("Lisboa") and Miriam Car o

("Carvalho"), states as follows:

### Nature of the Action

1.      By this action, Coverall seeks a declaration (i) that it has satisfied ce  n

obligations under the parties' written Franchise Agreement or, in the alternative (ii) that  y

claims that Coverall failed to comply with those obligations are time-barred. Coverall also s  :s

the costs and fees incurred in connection with this action, as provided for in the pa  s'

arbitration agreement.

### Parties

2.      Coverall is a Delaware corporation with its principal place of business in  a

Raton, Florida. Coverall is a sales and marketing company engaged in the business of se  g

franchises to operate commercial janitorial cleaning businesses. Coverall franchisees have  e

right to use Coverall's trade names, marks, and operating system (the "Coverall® System  n

connection with their franchises. Coverall trains its franchisees in all aspects of owning    ir
own business, including how to manage cash flow, how to hire and fire employees, and hc    o
grow their business. Coverall also provides its franchisees with training in state of th    rt
cleaning methodologies. To provide franchisees with a firm footing in their new businesse:    d
generate immediate cash flow, Coverall provides its franchisees with an initial customer    e.
Thereafter, franchisees may procure customers on their own or purchase additional bus    ss
from Coverall.

3.    Respondents Lisboa and Carvalho are residents of Massachusetts. Lisboa    id
Carvalho are franchisees of Coverall.

## The Parties' Written Franchise Agreement

4.    On or about July 24, 2002, Lisboa and Carvalho entered into a written Jani    al
Franchise Agreement (the "Franchise Agreement") with Coverall d/b/a Coverall of B    in
pursuant to which Coverall granted Lisboa and Carvalho a franchise to operate a comme    al
janitorial business in the Boston, Massachusetts area. (A true and correct copy of the Fran    se
Agreement is attached hereto as Exhibit A.)

5.    Lisboa and Carvalho paid $11,500 for the franchise they acquired, $5,0(    of
which was paid upon execution of the Franchise Agreement. The $6,500 balance o    1e
franchise fee was financed pursuant to a July 24, 2002 promissory note which Lisboa    id
Carvalho executed in favor of Coverall.

6.    Under the Franchise Agreement, Coverall was required to provide Carvalh    id
Lisboa with one or more customer accounts totaling $2,000 in gross volume per month    1e
"Initial Business Package"). The Franchise Agreement provides that Coverall had one hur    ed

twenty (120) days from the date on which Lisboa and Carvalho completed training to fulfil   ie
Initial Business Package.

7.      Lisboa and Carvalho were not contractually obligated to accept any of   ie
customer accounts offered by Coverall. However, in the event Lisboa and Carvalho rejec   a
customer account that was timely offered, the amount of that account would be credited tov   ls
Coverall's fulfillment of the Initial Business Package.   Assuming the account was   ot
unreasonably rejected, Coverall would nonetheless remain obligated to offer the amou   of
business rejected by Lisboa and Carvalho within a reasonable period of time after the expir   n
of the 120 day period.

## The Relief Sought

8.      Lisboa and Carvalho completed training on August 28, 2002.  As a r   t,
Coverall had until December 28, 2002 to fulfill their Initial Business Package.

9.      Coverall offered Lisboa and Carvalho numerous accounts throughout the 12(   y
period.  Lisboa and Carvalho accepted some of the accounts, rejected some of the accounts   d,
on other occasions, failed to respond to Coverall's efforts to determine whether they   e
interested in accounts.  Coverall nonetheless continued to offer Lisboa and Carvalho accou   o
fulfill the Initial Business Package.

10.     Lisboa and Carvalho have asserted that Coverall failed to satisfy its obligati   o
fulfill the Initial Business Package.  Coverall contends that it has fulfilled its obligations t   er
the Franchise Agreement.

11.     Accordingly, there is an actual controversy between the parties in this case a   a
declaration of the rights of the parties would terminate the controversy or some part thereof.

12.    Coverall seeks a declaration that it has satisfied its obligation to fulfill the Ii al Business Package under the Franchise Agreement.

13.    In the alternative, Coverall seeks a declaration that any claims regai ig Coverall's failure to fulfill the Initial Business Package are barred by the contractual limita is period. The Franchise Agreement provides, in Paragraph 22, that "[a]ny and all claims id actions arising out of or relating to this Agreement, the relationship of Franchisee and Cov .l, or Franchisee's operation of its business . . . shall be commenced within two years fron ie occurrence of the facts giving rise to such claim or action, or such claim or action sha ie barred."

14.    Coverall was obligated to fulfill the Initial Business Package by Decembe 8, 2002. In the event Coverall failed to satisfy that obligation, Lisboa and Carvalho were obli; :d to assert any claims based on that alleged failure no later than December 28, 2004.

15.    Finally, despite their contractual acknowledgment that they are indepei nt contractors and not employees, and despite the nature of the parties' relationship, Lisboa id Carvalho have asserted that they are employees and, as a result, are entitled to, among er things (i) time-and-a half rate of pay for any hours worked in excess of 40 hours/week i) payment for travel time, (iii) workers' compensation insurance, (iv) a certain level of wa3e id a guarantee of minimum wage, and (v) unemployment benefits. Coverall contends that L ia and Carvalho are franchisees, not employees, and seeks a declaration to that effect.

**WHEREFORE,** Coverall respectfully requests that the Arbitrator issue an award:

A.    Declaring: (i) that Coverall timely satisfied its obligation to fulfill the I   al Business Package under the Franchise Agreement or, in the alternative, declaring that any cl   is regarding Coverall's failure to fulfill the Initial Business Package are barred by the contra   al limitations period; and (ii) that Lisboa and Carvalho are franchisees, not employees, of Cove   .

B.    Awarding Coverall the costs and fees incurred in this arbitration, as provide   or in the parties' Franchise Agreement; and

C.    Such other and further relief as the Arbitrator deems just and proper.

**COVERALL NORTH AMERICA, INC.,**

By:    _____

One of its Attorneys

Michael D. Vhay (BBO# 566444)
**DLA Piper Rudnick Gray Cary US L**
One International Place, 21st Floor
Boston, MA 02110
(617) 406-6000

Norman M. Leon
**DLA Piper Rudnick Gray Cary US L**
203 North LaSalle Street, Suite 1900
Chicago, Illinois 60601
(312) 368-2192

Dated: August 30, 2005

5

# COVERALL®

# JANITORIAL FRANCHISE AGREEMENT

## COVERALL®
## JANITORIAL FRANCHISE AGREEMENT
## TABLE OF CONTENTS

| Paragraph | | ge No. |
|---|---|---|
| - | Information Regarding Franchisee and Franchise Package | 1 |
| 1 | Use of Trade Name, Service Marks, and Confidential and Proprietary Information | 2 |
| 2 | Term and Renewal | 3 |
| 3 | Territory | 4 |
| 4 | Initial Business and Guarantee | 4 |
| 5 | Additional Dollar Volume | 5 |
| 6 | Business and Management Services Provided By Coverall | 6 |
| 7 | Franchise and Other Fees | 8 |
| 8 | Refunds | 10 |
| 9 | Franchisee Business Operations | 11 |
| 10 | Franchisee Service to Customers | 12 |
| 11 | Keys and Security | 14 |
| 12 | Restriction on Use of Confidential Information | 14 |
| 13 | Franchisee is an Independent Contractor | 15 |
| 14 | Insurance | 15 |
| 15 | Indemnification | 16 |
| 16 | Assignment | 17 |
| 17 | Termination | 18 |
| 18 | Procedures After Termination | 19 |
| 19 | Non-Competition | 20 |
| 20 | Informal Dispute Resolution | 21 |
| 21 | Additional Remedies for Breach | 21 |
| 22 | Time to Assert Claims | 23 |
| 23 | Governing Law | 23 |
| 24 | Entire Agreement | 23 |
| 25 | Amendment | 23 |
| 26 | Waivers | 23 |
| 27 | Force Majeure | 23 |
| 28 | Severability | 23 |
| 29 | Notices | 23 |
| 30 | Successors Bound | 24 |
| 31 | Survival of Provisions | 24 |
| 32 | Captions | 24 |
| 33 | Guaranty | 24 |



FRANCHISE # F686

NO 

# COVERALL NORTH AMERICA, INC.
### d/b/a Coverall of Boston
105 Central Street, Suite 110
Stoneham. Massachusetts 02180
## JANITORIAL FRANCHISE AGREEMENT

THIS AGREEMENT (hereinafter referred to as "Agreement") is entered into by and between Coverall North Ame , Inc., dba
Coverall of Boston, a corporation organized and existing under the laws of the State of Delaware, hereinafter  :rred to as
"Coverall," and __MIRIAM CARVOLHO / SAMIRA LISBOA__ hereinafter referred to  gularly or
collectively) as "Franchisee" for the purposes of allowing Franchisee to operate a business as a Franchisee of Cover  Franchisee
is doing business as a:

☐ Sole Proprietorship   ☑ Partnership   ☐ Corporation, incorporated under the laws of _____

Effective Date of Agreement: The effective date of this
Agreement will be the date it is signed by the Regional
Director and Franchisee; provided, however, that if the
Agreement is not signed by a corporate officer as provided
on the last page of this Agreement, then the Agreement will
not be effective.

Initial Franchise Fee: $___11,500____

Down Payment: $_____5000____

Amount Financed by Coverall: $___6500____
(with interest at 12% per annum)

Term of Franchise ("initial Term"): 20 years
**Franchise Package**
Package Purchased:   P- ___2000_____

Monthly $ Volume of Initial Business: $___2000____

Initial Business Offering Period: __120__ days
(in which initial Business shall be offered after Franchisee's
completion of initial training - calculated per Paragraph 4A
hereof)

Financing Period: ___24___ months
(equal consecutive monthly installments of princi  & interest)

Amount of Each Monthly Installment: $__3.2__  _98_

The first installment of principal and interest sh  ie paid
on the last day of_____Mod_____,  02 .

REPRESENTATIONS    Franchisee makes the following representations: If Franchisee is a sole proprietor, partn  ip, or
corporation, there is set forth below, as the case may be, the name, address and other information of the sole propriet  f each
partner of the partnership, or of each shareholder in the corporation:

| Name | Address | Phone | Social Security # | P ntage rest* |
|---|---|---|---|---|
| MIRIAM CARVOLHO | 102 HARVARD ST UNIT | 781-395-5836 | 324-98-028 | 5.2% |
|  | Met Fort, MA 02155 |  |  |  |
| SAMIRA LISBOA | 74 Bowdoin ST | 781-395-2166 |  |  |
|  | Met Forl, MA 02155 |  |  |  |

*As to a partnership, this shall indicate the percent owned in the capital and/or profits of the partnership. As to a cor  ation,
this shall indicate the percent owned of the outstanding stock of the corporation.

Federal I.D. # of Franchisee if a partnership or corporation: _____

Address for mailing notices to Franchisee: _____

Franchisee acknowledges receipt from Coverall of a Franchise Disclosure Document which describes the Franch  to be
operated pursuant to the terms of this Agreement. Franchisee acknowledges receipt of a completed copy of this Agre  ent at
least five (5) business days prior to its execution.

_____
**Franchisee's Signature**

_____
**Franchisee's Signature**

Exhibit A.1 to
Janitorial Franchise Offering Circular

## RECITALS:

A.    Coverall is the owner of certain trademarks and service marks, including the marks "Cov   $1^{®}$" and "Coverall Cleaning Concepts$^{®}$;" and

B.    Coverall, as the result of the expenditure of time, skill, effort, and money, has developed   owns a distinctive system ("the System") relating to the establishment and operation of janitorial cleaning service   inesses. The distinguishing characteristics of the System include, without limitation, methods, procedures, star   ds, and equipment for janitorial cleaning and business services; procedures for quality control and customer   istance; marketing concepts; bidding, contracting, and billing procedures; training, assistance, advertising, and p   iotional programs; all of which may be changed, improved, and further developed by Coverall from time to time   id

C.    Coverall, as part of its business operations, licenses the use of its name and service mark   :overall franchised professional cleaning and maintenance businesses which provide cleaning, maintenance an   nitorial services to commercial cleaning customers, and provides Coverall's franchisees with the various compoi   s of the System for use in their Coverall businesses; and

D.    Coverall, as part of its business operations, obtains customer accounts, which are contra:   ietween Coverall and cleaning customers, under which Coverall delegates the performance of services to its franc   :es; and

E.    Franchisee desires to utilize the trade name, service mark, reputation, techniques, and the   :stem of Coverall, as a Coverall franchisee, in operating a commercial janitorial cleaning service business.

## TERMS OF AGREEMENT

NOW, THEREFORE, for and in consideration of the mutual promises and covenants contained   :ein and provided for hereunder, the parties agree as follows:

1.    USE OF TRADE NAME, SERVICE MARKS, AND CONFIDENTIAL AND PROI   :TARY INFORMATION.

A.    Coverall to License Franchisee.  Coverall hereby grants to Franchisee a non-exclu   license, upon the terms and conditions contained herein, to use and display "Coverall$^{®}$," "Coverall Cleaning (   cepts$^{®}$," "Coverall and Design$^{®}$," "The Art And Science Of Cleaning$^{®}$," "Making Your World A Cleaner Place$^{®}$   When It Has to be Absolutely Clean$^{®}$," "Customers for Life$^{®}$," and/or such other names and designs as Coverall mi   om time to time designate, as Franchisee's trademarks, service marks, trade names, and logos and the labels .   designs pertaining thereto (the "Marks"), but only in connection with the rendering of Franchisee's services in the   imercial janitorial service business in the territory as described in Paragraph 3, hereof, and only on those items anc   the form approved by Coverall. Nothing herein contained shall be construed to permit the use by Franchisee of t   Varks in any medium in any other manner or for any other purpose except as expressly provided for herein. Cover   xpressly reserves all rights with respect to the Marks, as well as to any trade secrets, processes, methods of op   ion, and goodwill granted hereunder, except as may expressly be granted to Franchisee under the provisi   hereof. Accordingly, Coverall reserves the sole right to institute administrative proceedings and/or litigation r   ·ding the Marks. Nothing herein shall give Franchisee any right, title, or interest in or to the Marks, trade secret   ·ocesses, methods of operation, or goodwill of Coverall except as a privilege and license, during the Term hereof, t   :play and utilize the same according to the limitations and upon the terms, covenants and conditions contained here   ·r as may be hereafter adopted by Coverall from time to time. Coverall further reserves the right to modify, discor   ie and/or change the Marks, name, and/or design. In the event of such modifications, changes, or discontinuations   anchisee will upon receipt of written notice thereof, and at its sole expense, promptly discontinue use of the discor   ied name and/or Marks and adopt and promptly begin use of the new or modified name and/or Marks, and promptl   iplement such modifications and/or changes to the System. Franchisee expressly and specifically waives any clair   iemands, or damages arising from or related to the loss of said Marks (or any variation thereof) and/or the loss o   sociation with or identification with the Mark "Coverall$^{®}$" arising out of Coverall's exercise of the above   ervation. Franchisee hereby agrees to use only the Marks designated by Coverall and to use such Marks only ir   : manner

© 2002 Coverall North America, Inc.


Initial

approved by Coverall. Franchisee agrees not to use the Marks or any name or design confusingly similar to in Franchisee's corporate or other legal or business name. Franchisee must promptly tell Coverall if Franchi about unauthorized use of Coverall's confidential, proprietary, and copyrighted information. Coverall will i this information as it deems appropriate.

   B.    Termination of License. Upon the expiration or termination of this Agreement and t herein granted, for any reason whatsoever, Franchisee agrees that it will, in addition to complying with Para; 18 and 19B and other applicable provisions hereof, immediately discontinue the use of the Marks, de surrender to Coverall each and every Mark and every label, promotional item, manual, form, and any physi bearing or containing any of said Marks and any other items that may be set forth herein; and Franchisee sha any of Coverall's confidential information, trade secrets, processes, methods of operation or goodwill, all of and shall remain vested solely in Coverall and used only co-extensively with the terms of this Agreer Franchisee shall not, directly or indirectly, thereafter operate or do business under any name or in any whether as an individual, agent, partner, shareholder, officer or director, that might tend to give the p impression that Franchisee is operating a business operated, owned, licensed by, or affiliated with Cov Franchisee shall cease to service in any fashion the customer accounts which it serviced while it was a Fr

   C.    Coverall the Sole Owner. Franchisee agrees that, as between Coverall and Franc Marks are the sole and exclusive property of Coverall; and Franchisee now asserts no claim and will herea no claim to any goodwill, reputation, or ownership thereof by virtue of Franchisee's licensed use hereof. F agrees that it will not do or permit to be done any act or thing in derogation of any of Coverall's rights in c with the same, either during the Initial Term of this Agreement or thereafter, and that Franchisee will use a for the uses and in the manner as permitted in this Agreement. Franchisee further agrees that Coverall may, discretion, revoke the license to use the name "Coverall" and/or design and direct the use of a modified, di substitute name and/or design, and that, in such an event, Franchisee will, at its sole expense, cease use of and/or design so revoked and promptly commence to use, implement and display in the operation of its bu such modified or substitute name and/or design.

   2.    TERM AND RENEWAL. This Agreement shall remain in full force and effect for a period (20) years from the date of execution (the "Initial Term") unless sooner terminated as hereunder provided. expiration of the Initial Term of this Agreement, Franchisee shall have no further rights in the Franch Agreement or the right to perform services under the contracts with the customer accounts unless Co Franchisee execute a written renewal agreement ("Renewal Agreement"), as provided below. The franchi renewed if Franchisee:

   A.    Gives Coverall written notice of Franchisee's intent to renew not more than one eighty (180) days nor less than ninety (90) days prior to the date of expiration of the Initial Term.

   B.    Executes, at least thirty (30) days prior to the date of expiration of this Agreemer current Coverall Janitorial Franchise Agreement ("Renewal Agreement"), and any other documents whic deems necessary for Franchisee to execute upon renewal ("the Related Documents"). The Renewal Agre the Related Documents, shall be on the same terms and conditions, including the renewal term (the "Renev as Coverall is then granting to new franchisees, excepting that there shall be no payment of any additiona fee or renewal fee for such Renewal Term; further excepting that the Renewal Agreement will not obligate provide any volume of Initial Business.

   C.    Is not in default of, and has been in substantial compliance with, this Agreement c agreement between Franchisee and Coverall on the date of giving notice, the date of execution of th Agreement, and the date of expiration of the Initial Term.

   D.    Executes a general release, in a form satisfactory to Coverall, releasing Coverall fr all claims, known or unknown, arising from this Agreement.

   E.    Has not received from Coverall, at least six (6) months prior to the date of expir

Initial Term, written notice of an intent not to renew, which notice states that Coverall is ceasing to do t   ness in the
area in which the Franchisee is located or provides for a waiver of the non-competition provisions of Pა   raph 19 of
this Agreement commencing upon expiration of the Term. Whenever in this Agreement the word "Ter   s used, the
word means the Initial Term, the Renewal Term, or both, as the context requires. Upon termination oı   ɔiration of
the Term, for any reason, Coverall shall have no obligation to repurchase the franchise from Franchis

      3.    TERRITORY. Franchisee may conduct its business solely in the area(s) in which the ᴄ   ᴈrall office
through which the Franchisee has purchased the Coverall franchise conducts business ("the Area").   nchisee is
granted no exclusive area within this territory and Coverall will sell numerous janitorial franchises in   d area.

      4.    INITIAL BUSINESS AND GUARANTEE.

      A.    Initial Business. Coverall will provide to Franchisee an initial franchise packagⴈ   nsisting of
one or more customer accounts, located in the Area in which Coverall, under the "dba" set forth on F   : l, hereof
conducts business. This initial franchise package shall consist of the gross volume per month ("Initial   iiness") to
be serviced by the Franchisee. The specific franchise package purchased by Franchisee is described on   ᴈe l hereof
under "Franchise Package." (i) In the event of the rejection by Franchisee of any customer account(s) w   h is timely
offered as a part of this Initial Business, Coverall shall be deemed to have fulfilled its obligations hereun   as regards
the time period within which Coverall must offer the monthly volume of the rejected Initial Busiŋ   customer
account(s). (ii) In the event Franchisee rejects Coverall's timely offer of Initial Business, Coverall   ıll remain
obligated to offer, within a reasonable period of time after the expiration of the Initial Business Offeriᴉ   'eriod (set
forth on Page 1 hereof), the amount of gross monthly dollar volume so rejected by Franchisee; provided,   vever, that
if Franchisee unreasonably rejects Coverall's offer of any Initial Business accounts made within a reᴈ   ıable time
after the Initial Business Offering Period has expired, Coverall shall be deemed to have fulfilled its   ⅼigation to
provide Initial Business for the volume of the account(s) which has been unreasonably rejected by Franc   ᴈe. (iii) In
the event of the unilateral discontinuance of servicing of a customer account(s) by Franchisee, Coｖ   ll shall be
deemed to have fulfilled its obligation to provide Initial Business for the volume of the account(s) w   ı has been
unilaterally discounted by Franchisee.

      The time within which Coverall shall offer the Initial Business to Franchisee (the "In   ⅼ Business
Offering Period," set forth on Page 1 hereof), shall, from the date of completion of Initial Training, be   culated as
follows:

          (1)    For Initial Business packages up to and including $3,000 gross volun   ᴈr
                month (e.g. all packages up to and including P-3,000), one hundred tᴠ   ty
                (120) days;

          (2)    For Initial Business packages exceeding $3,000 gross volume per ɱ   th
                (e.g. all packages larger than P-3000), one hundred twenty (120) dayჽ   ıs
                an additional thirty (30) days for each $1,000 (or portion thereof) in   ss
                volume per month over the initial $3,000.

| Example: | Package Size | Initial Business Offering Period | (Accordingly, if Franchisee purchases a | :000 and |
|---|---|---|---|---|
| | P-5000 | 180 days from completion of training | completes Initial Training on March 1, ა Initial Business must be offered on or befoᴦ of that same year.) | :5,000 in .ugust 28 |

      B.    Guarantee. Coverall will offer to replace business volume provided as par   the Initial
Business with other replacement business volume of equal monthly dollar volume if the cleaning custor   fails to pay
for services satisfactorily rendered, or if the services of the Franchisee are terminated for any reason   :ept faulty
workmanship, lack of trustworthiness, or other claimed defaults on the part of Franchisee. Coverall   l offer this
replacement business volume within a reasonable time. This Initial Business Guarantee is proviᴄ   under the
following conditions:

MC̲ / Initial    tial

(1)       for up to a maximum of twelve (12) months from the starting date of Fra    isee's
services if, for each month of service, Franchisee (i) performs monthly inspections with the customer or rep    ment
customer, and (ii) submits to Coverall by the fifth day following each inspection a completed Inspection Re    (also
known as a Survey Report) signed by the customer. If for any month during this twelve (12) month period F    chisee
fails to perform a monthly inspection for any account(s) and timely submit a completed Inspection Repo    r that
account(s), as above provided, then and in such event the last six months of this twelve (12) month Initial    siness
Guarantee (or such portion of the remaining six months of any account(s) for which Franchisee has failed to    rform
monthly inspections and timely submit completed Inspection Reports) will, for such account(s), be forfeite    nd the
Initial Business Guarantee will remain for said account(s) only for the balance of the first six month period,    ny; or

(2)       for six months from the starting date of Franchisee's services, if monthly in    ctions
are not performed and completed Inspection Reports are not submitted; and

(3)       all replacement customers are guaranteed for the remainder of the initial g    antee
period.

C.       The time within which Coverall must offer the Initial Business shall be extended    n the
parties' mutual agreement or for the following periods of time in the following circumstances:

(1)       Retraining of Franchisee.  If retraining of Franchisee is required pu    nt to
Paragraph 6A(2) hereof, the time for offering Initial Business shall be suspended as provided in Paragrap    A(2).

(2)       Franchisee's Material Breach of the Agreement.  If Franchisee is in brea    f any
material provision of this Agreement or any other agreement between Franchisee and Coverall, the time wit    which
to offer the Initial Business will be suspended until all material breaches are cured. Coverall's right to su    d the
offering of Initial Business as is set forth in this Paragraph will not waive Coverall's rights under this Agre    ent to
terminate Franchisee's franchise for such material breach.

D.       In the event Coverall fails to timely offer Initial Business in accordance with the pro    ons of
this Paragraph 4, Franchisee's sole remedy shall be as set forth in Paragraph 8C of this Agreement.

5.     ADDITIONAL DOLLAR VOLUME.

A.       Additional Dollar Volume Offered by Coverall.  During the Term of this Agreement    verall
may from time to time and at any time provide Franchisee an increase in either the number of customer    ounts
and/or the dollar volume of customer accounts which Franchisee services and/or an increase in existing    siness
through an increased percentage of occupancy or scope of services required (separately and collectively    wn as
"additional accounts," "additional customer accounts," "additional dollar volume," or "Additional Busi    "). If
Franchisee accepts such additional dollar volume on its behalf, Franchisee shall pay Coverall a sales and mar    ng fee
pursuant to Paragraph 7B of this Agreement.  Such additional dollar volume shall be subject to the t    s and
provisions of this Agreement except for the provisions of Paragraph 4.

B.       Guarantee.  Subject to the terms and conditions set forth in this Paragraph, the    tional
dollar volume which is provided by Coverall (as described in Paragraph 5A above) shall be guaranteed fo    to six
months under the following circumstances: The additional dollar volume will be replaced with equal mont    dollar
volume if the customer fails to pay for services rendered or if the services of the Franchisee are terminat    or any
reason except faulty workmanship, lack of trustworthiness, or other claimed defaults on the part of F    hisee.
Coverall will replace this additional dollar volume within a reasonable time. This guarantee for additio    dollar
volume is provided under the following conditions: (i) for up to six months from the starting date of Fr    isee's
services if, for each month of service, Franchisee performs monthly inspections with the customer or re    ement
customer and submits to Coverall by the fifth day following each inspection a completed Inspection Report    ned by
the customer; and (ii) all replacement customers shall be guaranteed for the remainder of the six month    rantee
period.

C.    <u>Non-Refundable Sales and Marketing Fee.</u>  Except as otherwise provided in Pa    aph 8C of
this Agreement, the sales and marketing fee either paid to Coverall, or which the Franchisee is obliga    to pay to
Coverall pursuant to a financing arrangement, for the procurement of Additional Dollar Volume is no    fundable.
Should an account purchased as Additional Dollar Volume cancel Franchisees' Services for any reaso    ranchisee
shall have no claim to a refund of the sales and marketing fee, and shall remain obligated to Cover    o pay the
balance due under any financing arrangement.

D.    <u>Additional Dollar Volume Obtained by Franchisee.</u>  Franchisee is entitled and    uraged to
increase its gross volume of business and obtain other customer accounts over and above its Initial    siness by
directly soliciting prospective customer accounts in accordance with Coverall's policies and procedures.    verall will
train Franchisee in its policies and procedures for soliciting business. Franchisee shall not pay Coverall    sales and
marketing fees for additional customer accounts located and secured solely by Franchisee. Any su    additional
customer account located or solicited by Franchisee must sign a contract with Coverall in the form    roved by
Coverall, and such additional customer accounts shall be subject to the terms of this Agreement except f    aragraphs
4 and 8 and the guarantee described in this Paragraph 5. Franchisee may set its own contract price for    vices.

6.    <u>BUSINESS AND MANAGEMENT SERVICES PROVIDED BY COVERALL.</u>  C    rall shall
provide the following services:

A.    <u>Initial and Additional Training</u>

(1)    <u>Initial Training.</u>  The training provided to Franchisee by Coverall aft    ranchisee
executes this Agreement and, generally prior to the time when Franchisee begins providing cleanin    ervices to
Coverall cleaning accounts, which training, among other things, deals with the operating of a franchise b    ess using
the Coverall system, is referred to in this Agreement as the "Initial Training". The Initial Training shall,    ccordance
with Paragraph 9A of this Agreement, be provided to the person(s) signing this Agreement unless Cove    in its sole
discretion, agrees in writing to allow a designee of Franchisee to attend the Initial Training in lieu of    person(s)
signing this Agreement. Up to two employees of Franchisee, approved by Coverall, may also atte    he Initial
Training. There shall be no charge for the Initial Training.

(2)    <u>Additional Training.</u>  Any training to be provided to Franchisee by C    all which
is not included in Initial Training, as hereinabove defined, is referred to in this Agreement as the    dditional
Training". The Additional Training shall include, but shall not be limited to, the re-attending, by Franch    and/or its
employees, of any training course attended by Franchisee, as an Initial Training course, or any other tr    ng course
provided by Coverall to Franchisee and/or its approved employee(s) after Franchisee and/or its approve    ployee(s)
have completed the Initial Training. Additional Training shall also include courses regarding the introd    on of new
methods which are introduced or provided after Franchisee and/or its approved employee(s) have compl    the Initial
Training. Franchisee's Additional Training may be offered through personal consultation and/or tl    gh group
seminars. Personal consultations will be scheduled at the request of Franchisee and may be conducted b    lephone or
in person. The frequency and scheduling of group seminars will be determined at the sole discretion    Coverall.
Additional Training shall be attended as provided in Paragraph 9A hereof. The cost and method of    yment for
Additional Training shall be as provided in Paragraph 7F hereof, although there shall be no cost for a    dditional
Training course beyond the Additional Training charge to Franchisee, or its approved designee, 1    up to two
additional employees of Franchise who may also attend that Additional Training course.

(3)    <u>Retraining of Franchisee.</u>  If (i) within a sixty (60) day period any    customer
accounts provided to Franchisee in fulfillment of Franchisee's Initial Business and/or Additional D    r Volume
complain to Coverall about Franchisee's faulty workmanship, lack of trustworthiness, or any other clair    default by
Franchisee, or (ii) if at any time any customer account provided to Franchisee in fulfillment of Franc    e's Initial
Business and/or Additional Dollar Volume cancels Franchisee's services for faulty workman    , lack of
trustworthiness, or other default under that customer's account contract, or (iii) if, pursuant to Paragra    0B of this
Agreement, Coverall discontinues Franchisee's services to a customer provided to Franchisee in    illment of
Franchisee's Initial business and/or Additional Dollar Volume, Coverall may, in any of these events, req    retraining
of Franchisee. In the event of such retraining, the time within which to offer (as regards Initial Busine    or provide

Exhibit A.1 to
Janitorial Franchise Offering Circular
Page - 6 -

(as regards Additional Business, any remaining Initial Business and/or Additional Dollar Volume, as the case may be, will be suspended from the time Franchisee is requested to attend retraining until Franchisee completes such retraining to Coverall's satisfaction. Retraining shall be deemed Additional Training, as that term is hereinabove defined. Accordingly, Franchisee will be charged an Additional Training fee for such retraining, in accordance with the provisions of Paragraph 7F hereof.

B. <u>Promotional and Sales Materials</u>. Coverall shall make available to Franchisee, at Franchisee's expense, promotional or sales materials for use in developing Franchisee's business.

C. <u>Billing, Collection, and Records</u>. Coverall has the exclusive right to perform all billing and accounting functions for services and supplies provided by Franchisee. At the beginning of each month Coverall shall invoice and collect payment from the customer accounts for all services and supplies provided by Franchisee. On the last day of the first month (if the last day of the month falls on a weekend and/or holiday, payment will made on the next business day) following the month in which the services and supplies are provided by Franchisee, Coverall will, subject to the provisions of Paragraph 6D, pay to the Franchisee amounts due Franchisee which were collected from customer accounts, excluding amounts retained by Coverall on Strategic Accounts, less amounts due Coverall for the fees described in Paragraphs 7 and 14, as well as note payments, transfer fees, equipment lease payments, advances, and any other amounts due Coverall or any third party lender through whom Franchisee has financed any purchase from Coverall. All customer payments made to Coverall and all credits due Franchisee shall be applied, in whole or in part, to Franchisee's then due or past due obligations under this Agreement and all other agreements, present and future, between Coverall and Franchisee.

If the services performed by Franchisee on any Coverall customer account(s) are discontinued for any reason, unless the customer account(s) is guaranteed as provided in Paragraphs 4 and 5 above, Coverall shall have the right to apply the entire amount of any payment subsequently received by Coverall from the customer account(s) no longer serviced by Franchisee to the balance (principle and/or interest) of any amount owed by Franchisee to Coverall, including but not limited to, promissory note(s), line of credit or any other financing provided to Franchisee by Coverall. Coverall shall also have the right but not the obligation, to pay any amount remaining after applying the funds to payment to Franchisee's obligations to Coverall, to any third party lender from whom Franchisee borrows funds to finance any purchase from Coverall. Nothing contained in this Paragraph 6C, however, shall be construed to release the Franchisee from its obligations to Coverall for any amount remaining due after applying the funds received from the discontinued customer account(s).

Coverall shall be entitled to recover from Franchisee all reasonable attorneys' fees, costs, and expenses, and out-of-pocket costs which may be incurred by Coverall in enforcing payment by any customer accounts and/or payment by Franchisee and Franchisee's lenders, guarantors, or others. Coverall may, in its sole discretion, assign to Franchisee the right to enforce payment on any delinquent customer account(s) which Franchisee is servicing. This shall include the right of Franchisee to file a lawsuit against the delinquent customer. In the event of such an assignment, Franchisee shall pay any and all attorneys' fees, court costs and expenses necessary to collect and enforce payment. If, as a result of the assignment, Franchisee collects monies due on a delinquent customer account, Franchisee shall be responsible to Coverall for any unpaid royalties, management fees, note payments and other payments (if any) due Coverall on amounts collected. Franchisee will keep Coverall timely advised as to any legal or other proceedings which Franchisee institutes, including, but not limited to, the outcome. Coverall shall also be entitled to grant a security interest in the receivables due from the customer accounts.

D. <u>Cash Flow Protection Services</u>. Coverall will advance to the Franchisee the amounts billed to customers serviced by Franchisee, whether or not those amounts have been collected, less amounts due Coverall. Advances will be made no earlier than the last day of the first month (if the last day of the month falls on a weekend and/or holiday, payment will be made on the next business day) following the month the services were provided. Advances attributable to billings for any one customer shall not exceed an amount equal to billings for sixty (60) days and shall not remain outstanding for a period exceeding ninety (90) days from the date on which the amount of the billing was due from the customer. If advances remain uncollected from the customer at the end of ninety (90) days, Franchisee shall repay Coverall the amount of the advance.

Initial _____    ial

loping a customer relations program for the benefit of the Franchisee's business.

(2) Coverall will use its best efforts to provide employees or contractors of perform janitorial services in substitution of Franchisee or Franchisee's employees, for up to two services, in the event that a bona fide emergency (which, by way of example, would include Franchis illness, involvement in an accident, or the death of Franchisee's close relative), prevents Franc employees from performing the services in a timely and efficient manner. Whether or not an event is emergency shall be determined by Coverall in its sole discretion. In the event that Coverall or its sub perform such substitute services, Franchisee shall receive no payment for such services rendered by its subcontractors. Franchisee hereby waives any and all claims, demands, or rights to payments fo services and further agrees that Franchisee shall not be entitled to any refund, rebate, or reduction previously paid or promised to Coverall in connection with such services.

The services described in this Paragraph 6 are an integral part of Coverall's support are provided by Coverall in consideration for a management fee payable to Coverall in an amount e percent (10%) of the amount billed customers for any and all services and supplies provided by 1 payable as described in Paragraph 7D, below.

7. FRANCHISE AND OTHER FEES; COVERALL FINANCING.

A. Franchise Fee. The "Initial Franchise Fee" is the amount set forth on Page 1 payable in cash, United States currency, upon the execution of this Agreement. A portion of the Initia Fee, $5,000, is the price that you pay for the license granted to you to use the Coverall® Marks, do Paragraph 1A. This $5,000 portion of your Initial Franchise Fee is entirely non-refundable. Coverall m a portion of the Initial Franchise Fee. The amount financed by Coverall shall be payable in equ installments of principal and interest at the rate of twelve percent (12%) per annum. Payment shall con the date set forth on Page 1, and shall continue thereafter on the last day of each consecutive month ui full. Franchisee shall execute a promissory note, payable to Coverall, in a form substantially sim attached as Exhibit B, reflecting the amount financed. Repayment of the amount financed by Covers made in accordance with the provisions of Paragraph 6C of this Agreement, through automatic withdra of the payment due from Franchisee's gross monthly billing. Coverall reserves the right to out servicing of any financing that it provides to the Franchisee pursuant to this Paragraph 7A, and Paragrap 7G, to a third party vendor.

Alternatively, Coverall may choose to: (1) make financing available to the Franchisee third party lender upon terms and conditions determined by the third party lender; or (2) convert the p note to the line of credit described in Paragraph 7G. If financing is provided through a third pa Coverall may service the third party financing through automatic withdrawal (debit) of the payment third party lender from Franchisee's gross monthly billings, and remit the payments directly to the lender.

B. Sales and Marketing Fee. A sales and marketing fee for additional dollar volume p accordance with Paragraph 5 shall be charged pursuant to this Paragraph 7B. The sales and marketi each customer account or accounts shall be payable at the time an additional customer account or ac accepted by Franchisee. If the sales and marketing fees exceed $150.00, Coverall may agree 1 Franchisee's purchase(s) of additional dollar volume. The amount financed by Coverall shall be payab monthly installments of principal and interest at the rate of twelve percent (12%) per annum over the time agreed upon by Franchisee and Coverall, which period shall not exceed twenty-four (24) mont financing is provided, at Coverall's discretion, through the line of credit described in Paragraph 7G or party lender. Payment will commence on the last day of the first month (if the last day of the month weekend and/or holiday, payment will be made on the next business day) following the month that Franchis servicing the account related to the amount financed, unless the purchase is financed through a line of which event, repayment shall be in accordance with the provisions of Paragraph 7G, or pursuant to the conditions of any third party financing. Franchisee may be required to execute a promissory note, substantially similar to that attached as Exhibit B, reflecting the amount financed.

© 2002 Coverall North America, Inc.

Exhibit A.1 to
Janitorial Franchise Offering Circular
Page - 8 -

Initial Init

The sales and marketing fee shall be calculated as set forth in the Coverall   licy and
Procedure Manual, as it may from time to time be modified or revised by Coverall.

C. Royalty. A royalty in an amount equal to five percent (5%) of the amount billed cu   mers for
any and all services and supplies provided by Franchisee, shall be payable monthly on the last day follov   ; the last
day of the month in which the services were performed. The sum total of the royalty and management fee   ay, at the
discretion of Coverall, be subject to minimum payments of $50 per month in the first year of operation a   $100 per
month thereafter. The minimum fee may be adjusted for increases in the Consumer Price Index.

D. Management Fee. A management fee, as described in Paragraph 6E, hereof, in an a   nt equal
to ten percent (10%) of the amount billed customers for any and all services and supplies provided by Fran   ee, shall
be payable monthly on the last day following the last day for the month in which the services were per:   ned.

E. Special Services Finder's Fee. A fee shall be charged for special service contracts, i   xample,
a one-time, non-recurring contract for services such as carpet cleaning, strip and waxing, or initial cle   ng. The
amount of the fee shall be twenty percent (20%) of the total special services contract price, unless Franch   sells the
job to the customer and furnishes all equipment, supplies and labor, in which case no fee will be charge   The total
special services contract price equals the gross revenue from the contract to Franchisee before deduction   ny other
fee(s) payable to Coverall. Amounts billed customers for special services are subject to royalty and mana   ent fees.

F. Additional Training Fee. A fee shall be charged for Additional Training, as that te   is
defined in Paragraphs 6A (2) and (3) hereof. The Additional Training fee for each Additional Training cot   attended
by Franchisee, and/or by Franchisee's employees, shall be Fifty ($50.00) Dollars. Coverall reserves the rig   o change
the fee for any Additional Training course by setting forth the fee, as so changed, in the Coverall Policy ar   rocedure
Manual as it may, from time to time, be amended. The Additional Training fee shall be due at the   ie of the
Additional Training; however, Coverall may, in its sole discretion, upon the request of Franchisee,   ance this
Additional Training fee so that it is payable in up to twelve (12) equal monthly installments of principal   i interest
(which interest shall be at the rate of twelve (12%) percent per annum). If Coverall agrees to finance thi   dditional
Training fee, Franchisee shall, prior to the Additional Training, sign a promissory note payable to Co·   ll, in the
amount of the Additional Training fee. Notwithstanding the above, Additional Training fees totaling l   han One
Hundred Fifty ($150.00) Dollars in the aggregate will not be financed, and will be due at the time of th   dditional
Training.

G.        Alternative Financing.   Coverall reserves the right to extend, or make   ailable to
Franchisee alternative forms of financing, including the following:

1.) Line of Credit. For purposes of this Agreement, the term "line of credit"   ll mean a
monetary amount which Coverall shall make available to Franchisee, and upon which Franchisee ma   raw, on a
continuing basis, up to the maximum limit of the line of credit, for payment of a portion of Franch   ·'s Initial
Franchise Fee, the purchase of Additional Dollar Volume (as defined in Paragraph 5A) and/or toward pa   ent of any
other item for which Coverall agrees to provide Franchisee financing under the terms of this Agreemen   ·he initial
limit of the line of credit shall be determined by Coverall, and Coverall may thereafter, in its sole discret   , increase
or decrease the amount of the line of credit. At such time as the line of credit is extended to Franchisee   ranchisee
will be required to execute such documents regarding the line of credit as are required by Coverall.   nchisee's
obligations under the line of credit shall be as follows:

(a) When there is no promissory note(s) payable by Franchisee at the tir   he line of
credit is extended:

(i.)      The initial amount financed under the line of c   t shall be
repaid by the Franchisee in monthly installments of principal and interest over a 24   48 month
period, as agreed on by Franchisee and Coverall. Repayment of the amount financed th   gh the line
of credit shall commence with the first Franchise statement reflecting billings to accc   s serviced

Initial   ial

by Franchisee. R    ent shall be made in accordance wit'  D  graph 6 C of this A;    :ment, through automatic  ..   .awal (debit) of the payment due fro..  .  .chisee's gross monthl'   llings. Nothing contained in this Paragraph 7 G (1)(a)(i) shall be construed to relieve the Franchi   of the obligation to repay any amount financed through the line of credit.

(ii.)    Interest charged under the line of credit will be compoun(   daily, at the rate of twelve percent (12%) per annum; however, Coverall shall have the right to ii   ase or decrease this rate of interest, upon first giving Franchisee 30 days prior written notice.

(iii.)    Additional Dollar Volume purchased by Franchisee usin   ie line of credit shall be repaid monthly in an amount equal to no less than twelve and one half (   ½ %) of the Franchisee's gross monthly billings attributable to the Additional Dollar Volume pu   ased.

(iv.)    If Franchisee is in default under the line of credit, Cove   . shall have the right to declare the entire line of credit balance immediately due and payable.    :nts of default shall include failure by Franchisee to timely make any monthly payment; 1   ire by Franchisee to timely perform any of the covenants, conditions, obligations or warranti   n this Agreement or any other agreement between Franchisee and Coverall; the levy of any at   iment, execution or other process against all or any part of the assets of Franchisee; the susp   ion or . abandonment of the business of Franchisee; Franchisee's making of a general assignme:   or the benefit of creditors; and the commencement of proceedings by or on behalf of Franchis   or any guarantors of this Agreement for dissolution, liquidation, or bankruptcy.

(v.)    Coverall shall have the right to assign its receivables,   uding Franchisee's obligations under its line of credit, to a third party lender.

(vi.)    The terms and conditions of the line of credit may be m(   ied or revised by Coverall, and these revisions shall be as published from time to time in the   werall Policy and Procedure Manual, or in a written statement to Franchisee.

(b)    When there is a promissory note(s) payable by Franchisee to Cove1   at the time the line of credit is extended, the obligation evidenced by promissory note(s) may, upon 30 days writ   notice to Franchisee, be converted to the line of credit. In the event of conversion, the terms of payment by F   chisee shall remain the same as in the note(s) converted; however, if the amount of the line of credit is sut   uently increased, the terms of the line of credit may thereafter be changed in accordance with the provisions of ]   igraph 7G(1)(a) hereof.

2.)    Third Party Financing.    Coverall may make available financing to Franchise   rough third party lenders upon terms and conditions to be determined by the third party lenders. Coverall m:   iervice third party financing and, if required, may remit the payment directly to the third party lender through   >matic withdrawal (debit) of the payment due from Franchisee's gross monthly billings.

8.    REFUNDS.    Except as is otherwise provided in this Paragraph 8, Coverall shall have no (   gation to refund any portion of any payment made under this Agreement.

A.    Initial Business.    If Coverall does not (i) offer Franchisee, as provided in Paragr   4A(i) hereof, all or any portion of the monthly dollar volume of Initial Business set forth on Page 1 of this Agre   ent; or (ii) offer Franchisee, within a reasonable time after the expiration of the Initial Offering Period, as p1   ded in Paragraph 4A(ii) hereof, a volume of Initial Business equal to that rejected by Franchisee upon its init   timely offer, provided Franchisee has not unreasonably rejected said post Initial Offering Period offer; or (ii   ffer to replace guaranteed monthly dollar volume as provided in Paragraph 4B hereof; then and in any s'   event Franchisee will, upon Franchisee's request, be entitled to payment of an amount determined and payable a   llows:

(1)  Determination of Amount Payable.    The monthly dollar volume of Initial B   iess (:) not timely offered by Coverall to Franchisee under Paragraph 4A(i); or, (ii) not unreasonably rejected by F   chisee

under Paragraph 4A(ii) hereof; u. (...) not replaced by Coverall under Paragr_.  .B hereof, as the case ma  e, shall
(a) be multiplied by two and eight-tenths (2.8) - the resultant figure shall be referred to as "the Gross Re  culated
Amount;" (b) The current replacement cost of Franchisee's starter kit shall be subtracted from the Gross Re  culated
Amount - the resultant figure shall be the "Amount Payable to Franchisee."

       (2)   Payment of Amount Payable to Franchisee. If, at the time of the determina  t of this
amount, Franchisee is indebted to Coverall, Franchisee's indebtedness shall be canceled up to the who  hereof,
before the balance (if any) is paid to the Franchisee in cash or kind.

       B.    Additional Business. I f Coverall is unable to provide or replace all or any  tion of
Franchisee's additional Business in accordance with the provisions hereof within a reasonable perio  f time,
Franchisee's sole remedy shall be a refund of whatever sales and marketing fee was actually paid by Frar  see for
the dollar volume of Additional Business not so provided or replaced by Coverall. If, at the time of this  nd, the
Franchisee is indebted to Coverall, this refund shall be accomplished by the cancellation, up to the whole  eof, of
such indebtedness, before the balance (if any) is paid to the Franchisee in cash or in kind.

       C.    Sole Remedy. Franchisee acknowledges and agrees that the payment by C  rall to
Franchisee of the Amount Payable to Franchisee, as provided in Paragraph 8A hereof, shall be Franch  's sole
remedy in the event of Coverall's (i) failure to timely offer Initial Business; or (ii) failure to offer Franchise  vithin a
reasonable time after the expiration of the Initial Offering Period, a volume of Initial Business equal to th  nitially
rejected by Franchisee upon timely offer (as provided in Paragraph 4A(ii) hereof); or (iii) failure to rep  : Initial
Business as provided in Paragraph 4B hereof. Franchisee further acknowledges and agrees that the  fund to
Franchisee, as provided in Paragraph 8B hereof, shall be Franchisee's sole remedy in the event Coverall i  able to
provide or replace any portion of Franchisee's Additional Business. Franchisee agrees that this payment  fund is
necessary as it would otherwise be difficult, if not impossible, to ascertain the damages incurred by Franc  e in the
event of any failure by Coverall to timely offer or replace Initial Business, or to timely provide or replace  litional
Business. The parties agree that such payment or refund is not a penalty to Coverall, but is a payment whi  overall
must provide as liquidated damages as a consequence of Coverall's failure to offer or replace Initial Bus  ss, or to
provide or replace Additional Business. Upon Coverall's paying Franchisee, as provided in Paragrapl  . or 8B
above as the case may be, Coverall shall be released from any obligation to offer or replace such Initial Bu  ss, or to
provide or replace such Additional Business, or to pay Franchisee any other damages.

    9.    FRANCHISEE BUSINESS OPERATIONS.

       A.    Franchisee To Attend Training Course. Franchisee shall attend the initial trainin  defined
and described in Paragraph 6A(1) hereof, which is provided by Coverall to all new franchisees, and any of  training
courses Coverall may prescribe with respect to the needs of Franchisee or a particular customer s  iced by
Franchisee. The person signing this Agreement on behalf of Franchisee shall attend the initial trai  ; unless
Coverall, in its sole discretion, agrees in writing to allow a designee of Franchisee to attend the initial trai  g in lieu
of the person signing this Agreement. Seminars shall be attended as provided in Paragraph 6A(1) here  lthough
Franchisee's employees may also attend such training. While there shall be no additional charge for tl  aking of
Initial Training courses, Franchisee shall be charged a fee for retaking Initial Training courses, inc  ing any
retraining required under Paragraph 6A (3) hereof. The fee for the retaking of Initial Training courses and  manner
of payment shall be as provided in Paragraph 7F hereof.

       B.    Franchisee to Abide by Policies and Procedures. Franchisee understands and ac  wledges
that every detail of the System is essential to Franchisee, Coverall, and other System franchisees in order t  develop
and maintain quality operating standards, (ii) increase the demand for the services sold by all franchise  perating
under the System, and (iii) protect Coverall's reputation and goodwill. Franchisee agrees to operate its t  ness and
provide service to customers in a manner consistent with the procedures, methods, and standards establi  l in such
training programs and all manuals and directives, which shall include, but shall not be limited to, t  Coverall
Janitorial Franchisee Policy and Procedure Manual ("the Policy and Procedure Manual"), as it may be an  ied from
time to time, and/or other policies or procedures which Coverall thereafter may issue from time to time.  anchisee
shall refrain from operating in any manner which reflects adversely on Coverall's Marks or System. Fra  isee may

© 2002 Coverall North America, Inc.

Exhibit A.1 to
Janitorial Franchise Offering Circular
Page - 11 -



not implement any modification to the System without Coverall prior written consent, and Coverall s    have the right to incorporate the modification into the System without compensation to Franchisee.

Franchisee agrees to abide by, and to supervise Franchisee's employees to    sure their compliance with, the terms of the Policy and Procedure Manual, as it may be amended from time to time    ranchisee acknowledges that Coverall has reserved the right to make such reasonable modifications and changes    he Policy and Procedure Manual as Coverall determines are important for the continued success and develop    nt of the Coverall System. Accordingly, Franchisee agrees that from time to time Coverall may reasonably mod    or change the Coverall System set forth in updates or changes to the Policy and Procedure Manual, or in    r written communications, including specifications, procedures, materials, standards and other policies and    ocedures, including those set forth in the Policy and Procedure Manual, and that Franchisee will be bound by s    changes. Franchisee agrees, at Franchisee's own expense, to adopt on a timely basis (but in no case later than si    (60) days after notice) any such modifications to the Coverall System set forth in updates or changes to the Policy a    Procedure Manual, or in other written communications, as if they were a part of the Coverall System at the time of    execution of this Agreement. Coverall shall notify Franchisee in writing as to changes in the Policy and Procedu    Manual or other changes in the operational structure of the Franchise.

C.    Quality Control Standards. Franchisee, realizing that quality control and u    rmity are important in the System, agrees to use in its business only such uniforms, equipment, supplies, produ    sales and promotional materials, control forms and other business forms as are prescribed or permitted by Covera    ranchisee agrees that it and its employees will wear approved uniforms and identification badges while on the    nises of a customer account. Franchisee is to maintain a safe place of business and comply with all OSHA require    ts, as well as all federal, state and local laws and regulations, and all industry standards. Franchisee shall use its l    efforts to procure qualified, competent, and conscientious employees and shall maintain a neat, clean, safe,    d orderly operation in keeping with Coverall's standards established by Coverall through its training and    icies and procedures and agrees to devote sufficient time and effort to its business. Franchisee hereby permit    overall to observe and evaluate from time to time the performance and quality of services by Franchisee.

D.    Modification to the System. Franchisee understands and agrees that due t    hanges in competitive circumstances, presently unforeseen changes in the needs of the market, changing customer    consumer demands, presently unforeseen technological innovations, and for protection of the Marks, the System m    be subject to modification, in order that it best serves the interests of Coverall, Franchisee, and the System.    cordingly, Franchisee expressly understands and agrees that Coverall may from time to time alter, modify, c    hange the components of the System, including, but not limited to, modifying, altering, varying, and adopting r    products, services, equipment, techniques, methods, programs, standards, training, sales training, forms, and    licies and procedures; adding to, deleting from, or modifying those programs and services which Franchisee is    horized to offer; and changing, improving, or modifying the Marks. Franchisee expressly agrees that it will, p    ptly, after being notified by Coverall of such alterations, variations, additions, deletions, modifications or chang    at its sole expense, abide by any such modifications, changes, additions, deletions and alterations, including those    forth in the Coverall Janitorial Franchisee Policy and Procedure Manual, as it may be amended from time to time

E.    Coverall's Right to Audit. Franchisee agrees to keep true and accurate busine    ccords and books of account which shall be open to inspection by Coverall or its duly authorized agent during re    r business hours and Coverall shall have the right to examine same, including other related records. Upon Cove    's request, Franchisee shall prepare and/or produce to Coverall any other information, including without limita    a financial statements and personal and business income tax returns, that will permit Coverall to verify that all fee    e Coverall are fully, accurately, and truthfully accounted for and that Franchisee is not otherwise in breach of th    greement.

F.    Customer List. Upon Coverall's written request, Franchisee shall provide Cov    l with a list of all cleaning customers for which Franchisee is and/or was providing cleaning services.

10.    FRANCHISEE SERVICE TO CUSTOMERS. The parties agree that it is of the utmc    mportance that the services provided by Franchisee to the consuming public be consistent and adhere to those unif    standards of quality associated with the Coverall System and serve to enhance the reputation and goodwill assoc    d with the



Coverall Marks. Franchisee thus acknowledges that the requirements of this Paragraph are necessary assure continuing public acceptance and patronage of the Coverall System.

       A.   <u>Franchisee to Furnish Staff, Equipment, Materials, and Supplies</u>. In considera : of the franchise fee paid by Franchisee, Coverall will provide, upon the opening of Franchisee's business, the equ: ent and supplies listed in Exhibit A of this Agreement. Thereafter, Franchisee will replace such equipment and : olies as needed and will provide all staff, other equipment, materials, tools, and other supplies necessary to service stomer accounts, including all janitorial services called for in each such customer contract. In order to protect verall's Marks, all such services will be performed in a good and workmanlike manner, satisfactorily to the custom .ccount for which such services are performed and in accordance with Coverall performance standards. Coverall r , at any time, inspect any premises serviced by Franchisee to assure that the quality of the services rendered is in a rdance with Coverall standards. If Franchisee desires to cease servicing a customer account, Franchisee must giv overall ten (10) days' written notice before ceasing such service; in such event any remaining guarantee on said ac nt shall be deemed to have been fulfilled, and Coverall shall have no obligation to replace said account.

       B.   <u>Protection of the Goodwill of the System</u>. Coverall, the Coverall System and I ks, and Coverall's Franchisees benefit from Coverall's goodwill, which arises out of Coverall's reputation in the m: t place. In order to protect Coverall and its Franchisees from the harm that arises from Franchisee activities the minish Coverall's goodwill and Marks, Franchisee agrees that Coverall has the right to discontinue Franchisee's vices to any customer upon the occurrence of any of the following:

       (1)   Franchisee fails to perform its obligations to the customer's satisfaction; or,

       (2)   The customer has made an oral or written complaint to Coverall; or,

       (3)   Coverall or the customer has given Franchisee written notice of Franchisee': ilure to perform and five (5) days after delivery of the notice either the customer or Cov ll is not satisfied that Franchisee has performed; or

       (4)   Franchisee receives three (3) written notices of failure to perform within a per. of sixty (60) consecutive days, regardless of whether the Franchisee cured the deficienc ; or

       (5)   Coverall receives a request from a customer to terminate its contract; or,

       (6)   Coverall receives a request from a customer to replace the Franchisee; or

       (7)   Franchisee services any customer other than as a Franchisee of Coverall; or

       (8)   Franchisee fails to service a customer on any two (2) occasions within a period ( xty (60) days; or

       (9)   Franchisee ceases or refuses to service, or discontinues servicing, a customer for y reason without Coverall's consent; or

       (10)   Franchisee engages in conduct that reflects materially and adversely upon the o[ tion and reputation of Coverall's and/or Franchisee's business(es) or the Marks or the S em.

      Upon the occurrence of any of the foregoing events, Franchisee agrees that all claims, demands rights to payments for any services performed after the date that Franchisee's services to a customer are disco iued are waived.

      With the exception of termination by a customer without cause during the Guarantee Period, as vided in Paragraph 10 B (4), Franchisee further agrees that Franchisee shall not be entitled to a no-charge replace nt of any

Franchisee and its employees who attend any or all of Coverall's initial training progr~ shall divulge only such confidential information therein obtained as may be necessary, and then only to such of it~ll time and/or part time employees, agents, or independent contractors as must have access to it, in order to cc~ct the operation of the franchise business, and Franchisee shall take those precautions as shall be necessary to ens~that its employees retain such information in confidence.

If Franchisee is a proprietorship or partnership, Franchisee shall cause the proprietor or the~ner, as the case may be, or other beneficial owner to execute Coverall's current Confidentiality/Non-Competition /~ement within ten (10) days of the execution of this Agreement or, in the case of an individual who assumes th~tus of proprietor, partner, or beneficial owner subsequent thereto, within ten (10) days after the assumption of s~status, and submit all such executed Agreements to Coverall. If Franchisee is a corporation, Franchisee shall c~e each officer, director, and shareholder thereof to execute Coverall's current Confidentiality/Non-Competition /~ement within ten (10) days of the execution of this Agreement or, in the case of an individual who assumes th~tus of officer, director, or shareholder subsequent thereto, within ten (10) days of the assumption of such status a~submit all such executed Agreements to Coverall. Franchisee, whether a sole proprietorship, partnership, or corpo~n, will cause each of its employees upon ten (10) days of the execution of this Agreement, or upon ten (10) days~hire of any employee, whichever last occurs, to execute a Coverall Confidentiality/Non-Competition Agreemen

13. **FRANCHISEE IS AN INDEPENDENT CONTRACTOR.** Franchisee is and shall remain~l times a completely independent contractor in business for itself, and shall have no right or interest in or auth~y over Coverall or any of Coverall's property or business. Neither Coverall nor Franchisee is the principal, agent,~ployer, employee, partner, officer, director, or owner of the other. Franchisee shall always hold itself out as an in~endent contractor in its dealings and communications with the public. Franchisee further agrees that it is not author~l to use the Marks or Substitute Marks in any capacity other than as provided herein, nor to sign on behalf of Cc~all any checks, drafts, leases, bonds, mortgages, documents, bills, contracts, bills of sale or any other instruments~riting. Franchisee shall be free to conduct its business as it may deem best in providing services to the custome~counts, independently of the supervision, management, and control of Coverall, but Franchisee agrees to abide b~l of the terms of this Agreement and all federal, state and local laws, OSHA requirements, and regulations of all g~mment agencies having jurisdiction over the customer's premises or the activities conducted by Franchisee and a~dustry standards. Franchisee shall be responsible for all personal property, use, and other taxes assessed by go~mental agencies. Franchisee shall be responsible for personal self-employment, income, and other taxes requ~i to be withheld and hereby assumes full responsibility for payment of the employer's portion of any social securit~d other taxes required to be withheld for all of Franchisee's employees. Franchisee shall also pay and/or withhol~xes and premiums for unemployment and worker's compensation insurance for itself and all of its employees, as r~ired by law. Franchisee shall provide Coverall, upon demand, proof of payment of all taxes due and compliance w~ll laws. Franchisee shall be responsible for all employment decisions and functions of its franchise business~:luding without limitation, those related to hiring, firing, training, wage and hour requirements, record keeping, s~vision, and discipline of employees and order and sequence of work.

14. **INSURANCE.** Franchisee shall be responsible for and shall indemnify and hold Covera~armless for all losses, damages to property, or injuries to persons arising out of or connected with the performa~or non-performance of Franchisee's business and services to customers, including any claimed damages for breacl~security and claims or demands for damages resulting therefrom of whatever nature. Franchisee will obtain janito~onding in an amount not less than $100,000. Franchisee further agrees to maintain comprehensive liability insuran~overing property damage, loss and personal injury in amounts not less than $1,000,000 per occurrence; $2,00C~0 in the aggregate; and a $5,000,000 umbrella policy; as well as comprehensive automobile liability, including per~il injury and property damage insurance, in the minimum amount of $50,000, or the amount required by state law; v~hever is higher; all such policies naming Coverall as an additional insured. Franchisee also agrees that its com~hensive liability insurance will not contain an exclusion for property in Franchisee's care, custody, and control. Ir~lition to the above, if any account serviced by Franchisee requires higher insurance coverage or a type of in~nce not specified herein, Franchisee will, at Franchisee's expense, obtain such insurance. Failure to do so will res~n loss of that account.

If required by state law, Franchisee shall obtain workers' compensation insurance for employees for statutory limits. Regardless of the requirements of state law, however, if Franchisee ha Franchisee is required by Coverall to have workers' compensation insurance for these employees. If F sole proprietorship or a partnership having no employees and Franchisee is not required by state law have worker's compensation insurance, Franchisee must obtain, in addition to the other insurance described in this Paragraph 14, insurance that provides on-the-job accident and disability coverage for th The insurance that a Franchisee who is either a sole proprietor or a partner is required by Coverall to provide for the following minimum coverage:    accidental death ($10,000.00), accidental disa ($10,000.00), paralysis ($10,000.00), temporary total disability ($250.00 per week for 52 weeks), continu ($250.00 per week for 52 weeks), and accident medical expense (maximum benefit of $25,000.00 fo Franchisee will also obtain employer's liability insurance in amounts no less than $100,000.00 each acci and all of its employees, and shall comply with all state and federal laws to maintain a proper un insurance account.

Coverall reserves the right from time to time to increase or decrease the minimum insu Changes shall be reflected in the Coverall Policy and Procedure Manual as it may be modified or revis providing Franchisee with a written policy directive stating the changes.

Franchisee further agrees that all such insurance policies maintained by Franchisee shall an insurance company (companies) in good standing and in compliance with all state and federal insura insurance regulatory agencies. Franchisee shall provide Coverall with thirty (30) days' written notic cancellation or termination of any insurance policy as defined herein. All insurance policies shall name C additional insured.

Franchisee shall provide Coverall with proof of the above coverages and bond upon de the Franchisee commencing work on any customer account. If Franchisee fails to obtain any or all specified herein and approved by Coverall, Coverall may (but shall not be required to), in addition to oth purchase such insurance for the benefit of Franchisee in which event Franchisee agrees to prompt Coverall for the cost thereof. In the event it becomes necessary for Franchisee to so reimburse Coverall of insurance as herein provided, Franchisee authorizes Coverall to deduct the costs of such insurance, basis, or as is otherwise necessary, from amounts to be paid by Coverall to Franchisee, as provided in P hereof. Types and amounts of insurance required to be procured by Franchisee may be modified, and the set forth herein may be changed, from time to time by Coverall, in its sole discretion, by written notice t through modification of policies and procedures, in the Coverall Janitorial Franchisee Policy and Proce as it may be amended from time to time, or other reasonable manner.

Coverall may allow Franchisee to participate in a group insurance plan which provid required general liability insurance and bonding to Coverall and its participating franchisees through company that names Coverall and Franchisee as insured. The cost of such liability insurance and janito provided through this Business Protection Program will include, in addition to the premium, a manage service charge as determined by Coverall, which shall be paid to Coverall. Coverall may also allow I participate in an insurance plan which provides workers' compensation, franchise owner on the job in employer's liability coverage as provided above, for Franchisee and/or Franchisee's employees. Prem above plans may vary in different states and may change from year to year. The plans are subjec modification, and/or cancellation. Future changes in premiums, coverages, etc. will be set forth in th Procedure Manual.

15.    INDEMNIFICATION. Franchisee shall be solely responsible for the services and resu performed by Franchisee and its employees, and shall indemnify and hold harmless Coverall and its a directors, officers and employees of each, and all other Coverall franchisees from all expenses, proceedings, claims, losses, damages, liabilities or actions of any kind or nature (including, but not lim and attorneys' fees) arising out of or in any way connected with Franchisee's operations. Franchisee f that if Coverall is made a party to a lawsuit or other legal action in connection with the activities of Fra Coverall may tender the defense and/or prosecution of the case to the Franchisee who shall be re



diligently pursuing the case or ____ ▲ at Franchisee's expense, or Coverall ____ hire counsel directly to     tect its
interests and bill Franchisee for all costs and attorneys' fees incurred in connection therewith, in w     h case
Franchisee shall promptly reimburse Coverall[7] all costs and expenses which Coverall incurred. The obli     ions of
Franchisee pursuant to this Paragraph shall survive the expiration or termination of this Agreement.

16.    ASSIGNMENT.

A.    <u>Coverall's Right to Assign the Franchise Agreement.</u> Coverall may, without the     sent of
the Franchisee, assign this Agreement, or Coverall's rights and duties under this Agreement, to any othe     ltity or
third party, whether affiliated with or independent of Coverall. Coverall may also assign to any other enti     ir third
party, whether affiliated with or independent of Coverall, any promissory note or other negotiable inst     lent of
Franchisee which is payable to Coverall. Said promissory note or other negotiable instrument may be a     ned to
another entity or third party in conjunction with or independent of this Agreement. Coverall's rights     er this
Agreement shall inure to the benefit of any such assignee or the legal successor to the interest of     verall.
Specifically, and without limitation to the foregoing, Franchisee expressly affirms and agrees that Coverall i     sell its
assets, its Marks, or its System outright to a third party; may engage in a private placement or public offeri     f some
or all of its securities; may merge, acquire other corporations, or be acquired by another corporation; may u     rtake a
refinancing, recapitalization, leveraged buyout or other economic or financial restructuring; and, with regar     any or
all of the above sales, assignments, and dispositions, Franchisee expressly and specifically waives ai     :laims,
demands, or damages arising from or related to the loss of said Marks (or any variation thereof) and/or     loss of
association with or identification with the Mark "Coverall" arising out of Coverall's exercise of the above n     vation.

B.    <u>Franchisee's Right to Assign the Franchise Agreement.</u>

(1)    An assignment is defined as a voluntary or involuntary, direct or indirect, a     nment,
transfer, sale, gift, or other disposition by the Franchisee or any of its owners of any interest in this Agre     nt, the
ownership of the Franchisee entity, or the franchise business, which assignment includes, without limi     on: (i)
assignment of ownership of stock or partnership interest; (ii) merger or consolidation or issuance of     :urities
representing an ownership interest in the Franchisee entity; (iii) assignment in a divorce, insolvency, part     :hip, or
corporate dissolution proceeding or otherwise by operation of law; and (iv) assignment in the event of d     1 of the
Franchisee or an owner of Franchisee, by will, declaration of or transfer in trust, or under the laws c     itestate
succession.

(2)    Franchisee may, with the written consent of Coverall obtained after thirt     0) days
prior written notice to Coverall, which consent will not be unreasonably withheld, assign this Agreement     person
meeting the qualifications then established by Coverall for granting new franchises ("the assignee"), pr     led: (i)
Franchisee provides Coverall a copy of any written agreements relating to the proposed assignment or tr     :er, and
any additional information which Coverall may require in order to determine whether it will grant its cor     t to the
proposed assignment or transfer; (ii) the assignee enters into the franchise agreement then used by C     rall for
granting new franchises; (iii) Coverall shall assess Franchisee a transfer fee of $1,500; (iv) Franchisee pays     Coverall
all amounts due by Franchisee to Coverall; (v) Franchisee executes confidentiality and non-competition ag     nents in
assignee's favor and in Coverall's favor with terms and conditions the same as the non-competition c     nant in
Paragraphs 12 and 19 of this Agreement; (vi) the assignee shall have the ability to immediately be in comp     ice with
all laws, regulations and ordinances governing commercial janitorial cleaning; and (vii) Franchisee execut     general
release, in a form satisfactory to Coverall, of any and all claims against Coverall and its affiliates and the     officers,
directors, employees, and agents; and (viii) the shareholders or partners of any corporate or partnersh     ssignee
comply with the guaranty provisions of Paragraph 33 of this Agreement.

(3)    Coverall may, in Coverall's sole discretion, withhold said written con     : of any
proposed assignment in the event that Franchisee is in default under the terms of this or any other agre     :nt with
Coverall until said default is cured.

(4)    If, at the time of an assignment of this Agreement, there is Initial I     ness or
Additional Dollar Volume to which Franchisee ("the assignor") is entitled, which Coverall has not yet     'ided to

© 2002 Coverall North America, Inc.

Franchisee, this Initial or Additional Dollar Volume shall be provided by Coverall[7] to the assignee withi    easonable amount of time after the assignee, as a Coverall janitorial franchisee, successfully completes the initial    ning, as is provided in Paragraphs 6 and 9 of this Agreement.

        (5)     If at the time of an assignment of this Agreement, Franchisee is perfori    g cleaning services ("services") on any accounts which are also to be transferred to Franchisee's assignee (w    ier Initial Business or Additional Dollar Volume), the assignee shall, within forty-five (45) days of the date of th    signment, complete, to Coverall's satisfaction, the initial training, as provided in Paragraphs 6 and 9 of this Agre    ent. Until assignee completes the initial training to Coverall's satisfaction, the assignor shall supervise the cl    ing of the assignee's cleaning accounts. If the assignee does not complete training to Coverall's satisfaction wit    forty-five (45) days or assignor does not provide the required supervision, Coverall may at the end of this forty-    (45) day period terminate the right of the assignee to continue to perform services on these assigned cleaning    counts, in which event Coverall will have no obligation to replace the dollar volume of business represented by su    erminated cleaning accounts.

        C.    <u>Franchisee's Right to Assign Cleaning Contracts</u>. Franchisee must obtain Cov    l's written consent before assigning the right to perform services under any individual customer accounts, which cc    nt will not be unreasonably withheld. A ten percent (10%) transfer fee, not to exceed $500 per account, may be    essed.

17.    <u>TERMINATION.</u> This Agreement may be terminated at the option of Coverall in t    event of a default by the Franchisee. In no event shall such termination relieve Franchisee of any of its obliga    is already incurred by or under this Agreement. A default is any of the following:

        A.    Franchisee's material breach of this Agreement or any other agreement betweer    verall and Franchisee. Material breach includes, without limitation, violations of Paragraphs 1, 7, 9, 11, 12, 13,    and 15.

        B.    (1)    One or more discontinuance, for cause, by a customer or by Coverall, o    anchisee's services to a customer account; or

        (2)    Franchisee's violation of Paragraph 10B(1), (2), and (3) hereof (Franc    e's failure to perform its obligations to the customer's satisfaction pursuant to the spirit and intent of this Agr    ent or the janitorial cleaning services contract; or if the customer has lodged an oral or written complaint with    verall, or Coverall has given Franchisee written notice of its failure to perform delivered by mail or in perso    ind (i) the customer or Coverall is not satisfied within five days from the date of delivery of such notice, or (ii) th    istomer or Coverall is dissatisfied on three occasions within a period of sixty (60) consecutive days); or

        (3)    Franchisee's violation of Paragraph 10B(7) hereof (Franchisee :    icing any customer in a capacity other than a bona fide Coverall Franchisee); or

        (4)    Franchisee's violation of Paragraph 10B(8) hereof (Franchisee failir    ) service a customer on any two occasions within a period of sixty (60) days); or

        (5)    Franchisee's violation of Paragraph 10B(9) hereof (Franchisee ceasing    refusing to service; or Franchisee's discontinuance of servicing a customer for any reason without Coverall's co    it); or

        (6)    Franchisee's violation of Paragraph 10B(10) hereof, or engaging in any    er conduct that reflects materially and adversely upon the operation and reputation of Coverall's or Franchisee's b    ness(es) or the Coverall Marks or the System.

        C.    Franchisee's insolvency or adjudication as bankrupt or the Franchisee's busine    oming into possession or control, even temporarily, of any trustee in bankruptcy or appointed receiver or the maki    f a general assignment for the benefit of creditors.

© 2002 Coverall North America, Inc.

Exhibit A.1 to
Janitorial Franchise Offering Circular
Page - 18 -



Initial

D.    Franchisee's attempt to assign this Agreement or the franchise business, or an ight or obligation hereunder, without first securing Coverall's written consent, upon thirty (30) days' written tice to Coverall.

E.    Franchisee's voluntarily abandoning the franchise business.

F.    Franchisee's having been charged with a work-related crime or any other ne that substantially impairs the goodwill associated with the Marks and System.

G.    Franchisee's failure on two or more occasions to comply with one or more of the visions of this Agreement or any other agreement between Coverall and Franchisee.

H.    Franchisee's breach of Paragraph 19 of this Agreement.

I.    Franchisee's engaging in conduct that reflects materially and adversely upon the eration and reputation of Coverall's or Franchisee's businesses or the Marks or the System.

J.    Franchisee's monthly revenues are below $150 for two consecutive months or for of any three months in a six-month period.

K.    A material misrepresentation in Franchisee's application to become a franchise

L.    At any time more than: (i) nine (9) months after the death or incapacity of Franch , or the appointment of a conservator or guardian for the person or estate of Franchisee, if Franchisee is an individ ; or (ii) nine (9) months after the death or incapacity of any of the general partners, or the appointment of a con ator or guardian for the person or estate of any of the general partners, if Franchisee is a partnership; provided, ho er, that this Agreement shall not terminate if within said nine (9) months this Agreement or the general partne interest herein is assigned in accordance with the provisions of Paragraph 16 of this Agreement.

If the termination results from default as defined in subparagraphs A, D, H, or L of this Par ph 17, termination may occur upon the expiration of ten (10) days following written notice of said default, or a erwise provided by law, if by then the Franchisee has failed to cure the default. If termination results from defaul defined in subparagraphs B, C, E, F, G, I, J, or K, of this Paragraph 17, termination may occur immediately, witho otice or opportunity to cure, unless otherwise provided by law.

18.    PROCEDURES AFTER TERMINATION.    Upon expiration, termination, or assign of this Agreement for any reason, Franchisee shall cease to be a Coverall Franchisee and shall do all of the fol ing acts and things, each of which shall survive the termination of this Agreement and shall remain an ongoing o ation of Franchisee:

A.    Immediately pay to Coverall all monies due thereunder to the date of termination d cease doing business in accordance with the provisions of Paragraph 19 of this Agreement. Any amounts due C rall at or after Franchisee's termination may be offset against any amounts collected by Coverall on Franchisee' half.

B.    Immediately and permanently discontinue the use of all Coverall Marks, or any of name or designation indicating or tending to indicate that Franchisee is or ever was an authorized Coverall nchisee. Furthermore, Franchisee shall not promote or advertise the fact that Franchisee was formerly a franchise affiliate of the Coverall organization.

C.    Promptly surrender to Coverall all stationery, letterheads, forms, manuals, pri l matter, films, books, cassettes, videotapes, and advertising containing Coverall Marks, including, but not lin d to, the proprietary mark "Coverall," or any similar names or marks or designation indicating or tending to i cate that

© 2002 Coverall North America, Inc.

Exhibit A.1 to
Janitorial Franchise Offering Circular
Page - 19 -



Franchisee is or was an authorized Coverall franchisee and promptly return to Coverall any equipr t leased to Franchisee.

D.    Immediately and permanently discontinue all advertising as a Coverall franc ee.

E.    Immediately and forever cease and desist from using the Coverall System, inc ing, but not limited to: Operating, Training, Sales, and Technical Manuals and aids, videotapes, cassettes, books, a rtising and promotional materials, and all trade secret and confidential and proprietary material delivered to Franc :e pursuant to this Agreement.

F.    Return the Coverall Janitorial Franchisee Policy and Procedure Manual; Opera r, Training, Sales, and Technical Manuals, and any other Manual, and videotapes which contain Coverall Marks or ich are part of the Coverall System.

G.    Return the unused portion of the initial equipment and supply package 1 :ived from Coverall, as well as any and all cleaning equipment and/or supplies which Franchisee is leasing from overall.

H.    Refrain from doing anything which would indicate that Franchisee is or er was an authorized Coverall franchisee.

I.    Maintain all books, records, and reports required by Coverall pursuant to Para ph 9 hereof for a period of not less than three (3) years after the termination of this Agreement and allow Coverall make final inspection and audit of Franchisee's books and records during normal business hours within said three year period for the purpose of verifying that all fees have been paid as required herein.

J.    Immediately and permanently discontinue wearing any apparel indicating tending to indicate that the Franchise is or was an authorized Coverall Franchise, and promptly surrender to Co all all such career apparel.

K.    Franchisee acknowledges and agrees that during the term of this Agreement, : rell as after termination, expiration, or transfer, Franchisee's name, home address, and home telephone number will lisclosed in Coverall's franchise offering circular.

L.    All obligations of the parties hereto which expressly or by their nature survive : expiration or termination of this Agreement shall continue in full force and effect notwithstanding such expiration rmination.

19.    NON-COMPETITION.    In consideration of the management services, expertise d services provided by Coverall, and the receipt by Franchisee of confidential information, and to protect tl ntegrity of Coverall's Marks and System, Franchisee agrees to the following:

A.    In-Term Covenant Not to Compete.  Franchisee agrees during the Term of tl Agreement and any Renewal Term that Franchisee will not to engage in, or have any financial interest in (either as individual, principal, owner, agent, employee, partner, stockholder, or director) any business (other than the fra ise granted hereunder) which performs janitorial and related cleaning and management services, franchising, sales :ontracting, or any related business anywhere. In addition, Franchisee will not, during the Term of this Agreeme ifluence or attempt to influence existing cleaning customers, whether of Franchisee or of other Coverall franchise or divert or attempt to divert from Coverall, its franchisees, or its independent contractors, any cleaning accounts v :h are being serviced by the Coverall system.

B.    Post-Termination Covenant Not To Compete.  In the event this Agreeme s assigned, terminated, or expires, for any reason whatsoever, Franchisee agrees not to compete, directly or indirec for a period of eighteen (18) months from the date of assignment, termination, or expiration with Coverall or any Coverall's affiliates or franchisees by engaging in or having any financial interest in (either as an individual, pri pal, owner, agent, employee, partner, stockholder, director, or in any other capacity) any business that performs bu ng cleaning

© 2002 Coverall North America, Inc.

Exhibit A.1 to
Janitorial Franchise Offering Circular
Page - 20 -



and maintenance services, in any county located partially or entirely wi.....i, or contiguous to, the N ......opolitan Statistical Areas in which Franchisee's Coverall Regional office conducts business, or within a 100-mile .....us of that Coverall Regional office, whichever distance is greater. Franchisee will not, during the time perio .....d in the geographic area covered by this Paragraph 19B, influence or attempt to influence previously existi .....cleaning customers, whether of Franchisee or of other Coverall franchisees, to divert or attempt to divert from C .....all or its franchisees any cleaning accounts which were being serviced by the Coverall system during the year p .....ding the date on which Franchisee left the Coverall system.

        C.    Persons Bound By Covenants Not To Compete. Any person or entity having .....legal or beneficial relationship to or interest in or traceable to, down, or through Franchisee is bound by the provis ..... of these covenants. Such persons shall include, but shall not be limited to, Franchisee's family members.

        D.    Court Modification of Agreement. The Franchisee agrees that this form of A .....ement is prepared for use in many jurisdictions with differing public policies and that such public polic .....change. Accordingly, the Franchisee agrees that the prevailing non-competition restrictions set forth above may .....nodified by a Court to the extent necessary to make the non-competition agreements valid and enforceable against .....nchisee.

### 20.    INFORMAL DISPUTE RESOLUTION.

        A.    Mediation. Except as is otherwise provided in Paragraph 20B, if a dispute aris .....out of or relates to this Agreement, or to the relationship of the parties, and if the dispute cannot be resolved or set .....through negotiation, the parties agree that prior to the filing of any arbitration or other legal action consiste .....with the provisions of this Agreement, they will attempt, in good faith, to settle the dispute by non-binding .....ediation administered pursuant to the Commercial Mediation Rules of the American Arbitration Association, or .....therwise agreed upon by the parties. The mediation shall take place in the Area in which Franchisee conducts its .....iness (as defined in Paragraph 3), and shall be administered by a neutral mediator agreed upon by the parties. In t .....vent the parties are unable to agree upon a mediator within 15 days of the date on which either party requests m .....tion of a matter, the mediator shall be provided by the American Arbitration Association. The costs of the media .....shall be shared equally by the parties.

        B.    Notwithstanding anything to the contrary in Paragraph 20A, if Franchisee's Cover .....ranchise Agreement has expired or been terminated, or if Franchisee has abandoned or failed to operate the Franch .....for more than 30 days, Coverall shall not be required to avail itself of non-binding mediation in matters dealing .....h (i) the collection, by Coverall, of royalties or management fees claimed to be owing to Coverall by Franchise .....r (ii) the collection, by Coverall, of amounts claimed to be owing to Coverall by Franchisee under any promi .....y notes, equipment purchases, or lines of credit.

### 21.    ADDITIONAL REMEDIES FOR BREACH.

        A.    Arbitration. Except as otherwise provided in Paragraphs 21A(14) and 21B, all c .....oversies, disputes or claims between Coverall, its officers, directors, agents and/or employees (in their respective ca .....ties) and Franchisee (and Franchisee's owners, officers, directors and/or any guarantors of this Agreement) arisi .....out of or related to the relationship of the parties, this Agreement, any related agreement between the parties, .....d/or any specification, standard or operating procedure of Coverall, including those set forth in the Coverall .....licy and Procedure Manual, which controversies, disputes or claims are not resolved in accordance with Paragrapl ..... shall be submitted promptly for arbitration.

        (1)    Arbitration shall be subject to the Federal Arbitration Act and, except a .....therwise provided in this Agreement or agreed upon by the parties, the then current Rules of th .....merican Arbitration Association for Commercial Arbitration.

        (2) The arbitration shall take place in the Area in which the Franchisee conducts its l .....ness, and shall be administered by the office of the American Arbitration Association or as mutua .....greed by the parties.



arbitrator, e      ' shall, subject to the provisions of           h 21C, be responsib      or the fees of
the arbitrator ap  ...nted by that party.

(4)    In matters involving an initial claim of Fifty Thousand Dollars ($50,00(   ) or less there
shall be one arbitrator.

(5)   In matters involving an initial claim of more than Fifty Thousand Doll   ($50,000.00),
the arbitration proceeding shall, unless otherwise agreed, be conducted before a p   l of three (3)
arbitrators.

    (i)    Coverall and Franchisee shall each appoint one arbitrator, and th   vo appointed
arbitrators shall appoint a third arbitrator to serve as Chair of the ar   ation panel.

    (ii)   If a party fails to appoint an arbitrator within thirty (30) days fron   e date of the
demand for arbitration, the appointment shall be made by the Amei   n Arbitration
Association, or such other entity as the parties mutually select.

(6)    The arbitrator or appointed arbitrators shall not alter or otherwise reform   terms of this
Agreement, or award any relief or grant any remedy not provided for in this   greement or
specifically excluded by this Agreement.

(7)    The arbitrator or appointed arbitrators shall have the right to grant mone   r relief only.
However, there shall be no award of exemplary or punitive damages.

(8)    The decision of the arbitrator or arbitrators shall be conclusive and b   ing upon all
parties, and judgment upon the award may be entered in any court of competent jurisd   n.

(9)    The parties agree to be bound by the provisions of any applicable limitati   n the period
of time in which claims must be brought, including any set forth in this Agreement.

(10)   The parties agree that in connection with any arbitration proceeding, eacr   rty shall file
any related counterclaim within thirty (30) days of the date of the filing of the cl   to which it
relates or be forever barred.

(11)   Franchisee and Coverall agree that arbitration shall be conducted on an i   vidual, not a
class wide basis.

(12)   The parties agree that discovery may be conducted in accordance with th   rovisions of
the Federal Rules of Civil Procedure.

(13)   A decision by the arbitrator or arbitrators (including any finding   fact and/or
conclusion of law) against either Coverall or Franchisee shall be confidential ar   nay not be
collaterally used against either of them in existing or subsequent litigation or arbitratio   volving any
other franchisee or third party.

(14)   Notwithstanding anything to the contrary in this Paragraph 21A, i   ranchisee's
Franchise has expired or been terminated, or if Franchisee has abandoned or failed   operate the
Franchise for more than 30 days, Coverall shall not be required to avail itself of arbitr.   a in matters
dealing with (i) the collection, by Coverall, of royalties or management fees claimed   oe owing to
Coverall by Franchisee; or (ii) the collection, by Coverall, of amounts claimed t   e owing to
Coverall by Franchisee under any promissory notes, equipment purchases, or lines of c   t.

© 2002 Coverall North America, Inc.

Exhibit A.1 to
Janitorial Franchise Offering Circular
Page - 22 -

Initial

B. **Injunction and Specific Performance.** Notwithstanding anything in Paragraphs
the contrary, Coverall shall be entitled to apply directly to a court of competent jurisdiction for t
preliminary and permanent injunctions and orders of specific performance enforcing the provisions of this
or any other related agreement pertaining to Franchisee's use of the Marks; the obligations of Franchise
confidentially or non-competition; any assignments or attempted assignments of this Agreement by Frar
matter relating to the ownership of the Franchise, and/or any other matter for which Coverall would have
remedy at law. If Coverall secures any such injunction or order of specific performance, Franchisee a
Coverall an amount equal to the costs incurred by Coverall in obtaining such relief, including, withou
attorney's fees, litigation costs and expenses, as well as any damages incurred by Coverall as a result of F
actions.

C. **Attorneys' Fees.** Should either Party incur attorney's fees in order to enforce th
conditions of this Agreement, including post-term covenants, whether or not an arbitration proceeding is ir
prevailing party shall be entitled to reimbursement by the other party of all litigation costs, including atto

D. **Survival.** The parties agree that the provisions of this Paragraph 21 shall con
force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.

22. **TIME TO ASSERT CLAIMS.** Any and all claims and actions arising out of or rel
Agreement, the relationship of Franchisee and Coverall[7], or Franchisee's operation of its business, broi
Party hereto against the other, shall be commenced within two years from the occurrence of the facts g
such claim or action, or such claim or action shall be barred.

23. **GOVERNING LAW.** This Agreement shall be interpreted and governed by the laws o
which the Franchise granted herein is located.

24. **ENTIRE AGREEMENT.** This is the full agreement of the parties. Any matter which is
written down and included in this document is not a term of this Agreement. To avoid any later misun
about the exact terms of the Agreement, each Party affirms, by affixing its signature to this Agreement, t
relied on any comment, promise, or representation not actually included within the Agreement itself. By
Agreement, the parties mutually agree that no evidence shall be admitted in any proceeding as to the exis
term or promise claimed to be a part of the Agreement unless that term is explicitly stated within the Agr
*NOT SIGN THIS AGREEMENT IF YOU ARE RELYING UPON ANY REPRESENTATION OR PR(
INCORPORATED INTO THIS AGREEMENT.*

25. **AMENDMENT.** This Agreement may not be modified, altered, or amended excep
executed by all of the Parties hereto.

26. **WAIVERS.** Waiver by Coverall of any one or more defaults shall not operate as
successive or other defaults and all of Coverall's rights shall continue notwithstanding any such waive

27. **FORCE MAJEURE.** No party hereto shall be liable for any loss or damage due to any
due performance of the terms hereof (except for the payment of money) by reason of strikes, lockouts, a
troubles, fires, riots, wars, embargoes and civil commotion, or acts of God. Any such delay shall extend
only so long as such event is in progress.

28. **SEVERABILITY.** If any term, provision, covenant, or condition of this Agreement is h
of competent jurisdiction to be invalid, void, or unenforceable, the remainder of the provisions herein sl
full force and effect and shall in no way be affected, impaired, or invalidated.

29. **NOTICES.** Any notices to be given hereunder by either Party to the other may be effec
either by personal delivery or by first class mail, postage prepaid. Mailed notices should be addressed
and to Coverall at the addresses set forth on Page 1 of this Agreement. Either Party may designate a diff
for notice in writing delivered to the other Party. Notices personally delivered shall be deemed re

and 21 to
entry of
reement
garding
see; any
adequate
s to pay
nitation,
chisee's

rms and
uted, the
ys' fees.

e in full

g to this
t by any
g rise to

e state in

actually
standing
it has not
ning this
ce of any
ient. *DO
'SE NOT*

a writing

vaiver of
waivers.

lay in the
ther labor
formance

by a court
remain in

in writing
ranchisee
nt address
ved when

© 2002 Coverall North America, Inc.

Exhibit A.1 to
Janitorial Franchise Offering Circular
Page - 23 -

delivered. Notices sent by mail shall be deemed received on the second day following mailing.

30.    SUCCESSORS BOUND. This Agreement shall bind, and shall inure to the benefit of, executor, administrator, personal representative, heirs, successors and assigns of each of the Parties.

31.    SURVIVAL OF PROVISIONS. Any provision or covenant of this Agreement which ex ssly or by its nature imposes obligations beyond the expiration or termination of this Agreement shall survive such iration or termination.

32.    CAPTIONS. The captions used in this Agreement are inserted as a matter of convenie    The text of any paragraph of this Agreement shall control its interpretation.

33.    GUARANTY. The partners of any partnership and the shareholders of any cor    ite entity constituting the Franchisee, and the partners of any partnership or shareholders of any corporate entity t    may own the shares of the partnership or corporate entity which is the Franchisee hereunder, (the names of suc    artners or shareholders are listed in on page one hereof), do by signing this Agreement, hereby (i) guaranty the pe    mance of all Franchisee's responsibilities and duties under this Agreement; (ii) guaranty the payment of all sun    hich may from time to time become due to Coverall under this Agreement; and (iii) agree to be bound by Paragrap    B, 12, 19, and 21 of this Agreement. Said partners or shareholders and their spouses shall also, at the time of the    :cution of this Agreement, execute the current form Guaranty to the Coverall Janitorial Franchise Agreement. Su    artners or shareholders also agree to execute all Promissory Notes executed by Franchisee.

This provision shall be equally binding upon the current shareholders of the corporate entity    iich is the Franchisee hereunder, and upon any additional shareholders who may subsequently obtain an ownership    :rest in the Franchisee. If Franchisee is a corporation, Franchisee specifically agrees that within thirty (30) day    ior to any additional shareholder or shareholders obtaining an ownership interest in Franchisee, that Franchisee s    l so notify Coverall in writing of this fact. At that time, Coverall will give Franchisee its then current Franchise    areholder guaranty form. Said form will be executed by said additional shareholder or shareholders concurrer    with their obtaining their ownership interest in Franchisee.

## SIGNATURES APPEAR ON THE FOLLOWING PAGE.

IN WITNESS WHEREOF, th.  ies hereto have caused this Agreemen.  )e executed on the da  id year written above (see Page 1 of this Agreement).

(If Franchisee is a partnership, this Agreement must be signed by each partner. If Franchisee is a corpo  on, this Agreement must be signed by a duly authorized officer.)

THIS AGREEMENT SHALL NOT BE VALID UNLESS SIGNED BY (i) FRANCHISEE;  i) AN AUTHORIZED REPRESENTATIVE OF COVERALL'S REGIONAL OFFICE; AND (iii) A COI  RATE OFFICER AT COVERALL'S CORPORATE OFFICE.

SANDRA   VAZ   LISBOA

FRANCHISEE: _____ MIRIAM   CARVALHO _____

(Print name of sole proprietor, partnership, or corporati  )

By: _____ Miriam Carvalh _____        07-24  '2

                                          Date Sign

By: _____ Lisboa _____               07.24.  2

                                          Date Sign

By: _____

                                          Date Sign

COVERALL NORTH AMERICA, INC.

By: _____ Joseph G. H. alls _____      7/24/

                                          Date Sign

Title: _____ Regional Director _____

Coverall of Boston

ACCEPTED ON THIS _30 d_ DAY OF _July_ , _2002_ .

(EFFECTIVE DATE OF AGREEMENT)

COVERALL NORTH AMERICA, INC.

_Glenn M. Miller_

By: _____ GLENN  M.  MILLER _____ , Vice President

© 2002 Coverall North America, Inc.

## PYLE, ROME, LICHTEN, EHRENBERG & LISS-RIORDAN, P.C.

Attorneys at Law
18 Tremont Street, Suite 500
Boston, MA 02108

Warren H. Pyle
David B. Rome
Harold L. Lichten*
Betsy Ehrenberg
Shannon Liss-Riordan**
Terence E. Coles
Katharine D. Shea

M. Amy Carlin
Nicole Horberg Decter**
Rebecca G. Pontikes
Alfred Gordon
Leah M. Barrault

Telephone (617) 367-7200
Fax (617) 367-4820

Tod    :ochran
Ω    ISEL

*Also admitted in Maine
**Also admitted in New York

September 14, 2005

**VIA MAIL AND FACSIMILE** (401) 435-6529
Wilma Rooney
Michaela E. Gaudette
Case Managers
American Arbitration Association
950 Warren Avenue
East Providence, RI 02914

Re:    Coverall North America, Inc.

Dear Ms. Rooney and Ms. Gaudette:

Coverall North America, Inc. ("Coverall") has filed eight arbitration
demands against individuals whom I represent; their names and the AAA case
numbers are listed below. I am writing to notify you that I represent these
individuals and that you should communicate with me, rather than directly with
them, in connection with these cases.

These individuals dispute that there is a valid arbitration agreement
between them and Coverall. A class action lawsuit against Coverall will be filed
in court imminently, asserting that these workers should have been classified as
employees of Coverall, rather than as independent contractors, along with other
related claims.

I request that these arbitration cases be stayed pending a judicial
determination regarding whether these claims may be heard in court or instead
whether they must be arbitrated.

In the event that the AAA does not immediately stay these arbitration
cases, and proceeds with the administrative conference calls for these cases that
are scheduled to begin tomorrow, September 15, 2005, I request that one call be

**PYLE, ROME, LICHTEN, EHRENBERG & LISS-RIORDAN, P.C.**

held, rather than eight separate calls. Michael Vhay represents Coverall in each of these matters, and I represent each of the respondents; accordingly, it would be much more efficient to hold one conference call rather than eight separate calls.

Please let me know if you have any questions, and whether these cases may be stayed and the administrative conference calls accordingly postponed.

Sincerely,

Shannon Liss-Riordan

cc:   Michael Vhay, Esq.

Cases:

Coverall North America, Inc. and Joao Padilha
Case No. 11-114-01899-05

Coverall North America, Inc. and Wanor de Carvalho
Case No. 11-114-E-01903-05

Coverall North America, Inc. and Sandra Lisboa and Miriam Carvalho
Case No. 11-114-01902-05

Coverall North America, Inc. and Amilton DeSouza and Carlos Furtado
Case No. 11-114-01907-05

Coverall North America, Inc. and Adelson Sodre
Case No. 11-114-E-01904-05

Coverall North America, Inc. and Luciana Canestrano
Case No. 11-114-01901-05

Coverall North America, Inc. and Napoleo Pereira
Case No. 11-114-E-01906-05

Coverall North America, Inc. and Marcos Martins
Case No. 11-114-01898-05